506 F.2d 33
 164 U.S.App.D.C. 371
 PACIFIC GAS AND ELECTRIC COMPANY, Petitioner,
v.
FEDERAL POWER COMMISSION, Respondent, General Motors
Corporation et al., Intervenors.
MISSISSIPPI POWER AND LIGHT COMPANY, Petitioner,
v.
FEDERAL POWER COMMISSION, Respondent, General Motors
Corporation et al., Intervenors.
 Nos. 73-1358, 73-1485.
 United States Court of Appeals, District of Columbia Circuit.
 Argued Feb. 21, 1974.
Decided June 26, 1974.
 
 Daniel E. Gibson, Oakland, Cal., with whom Malcolm H. Furbush and Howard V. Golub, San Francisco, Cal., were on the brief, for petitioner in No. 73-1358.
 Peyton G. Bowman, III, Washington, D.C., with whom Richard M. Merriman and J. Richard Tiano, Washington, D.C., were on the brief, for petitioner in No. 73-1485.
 John Staffier, Atty., Federal Power Commission, for respondent. Leo E. Forquer, Gen. Counsel, Federal Power Commission, and George W. McHenry, Jr., Sol., Federal Power Commission, were on the brief, for respondent. Platt W. Davis, III, Atty., Federal Power Commission, also entered an appearance for respondent.
 
 
 1
 Edward J. Grenier, Jr., Washington, D.C., with whom Richard P. Noland, Richard J. Pierce, Jr., and David C. Evans, Washington, D.C., were on the brief, for intervenors in No. 73-1358 and intervenors, Gen. Motors Corp., Johns-Manville Corp., Brick Institute of America and Georgia Industrial Group in No. 73-1485.
 
 
 2
 Arnold D. Berkeley, Washington, D.C., and David R. Straus, Chicago, Ill., were on the brief, for intervenors, State of Louisiana, Louisiana Municipal Association, Louisiana Public Service Commission and St. James Parish Utilities in No. 73-1485.
 
 
 3
 Raymond P. Buschmann, Chicago, Ill., entered an appearance for intervenor, Illinois Power Co. in No. 73-1485.
 
 
 4
 Before BAZELON, Chief Judge, and MacKINNON, Circuit Judge, and A. SHERMAN CHRISTENSEN,* United States Senior District Judge for the District of Utah.
 
 MacKINNON, Circuit Judge:
 
 5
 Petitioners assert that we have jurisdiction under section 19(b) of the Natural Gas Act[1] to review Order No. 467, 49 F.P.C. 85,[2] which the Federal Power Commission issued on January 8, 1973. Order No. 467 is a 'Statement of Policy' on 'priorities-of-deliveries by jurisdictional pipelines during periods of curtailment' which the Commission indicated it proposes to implement in all matters arising under the Act. The petitioning customers of pipeline companies, whose deliveries are subject to curtailment during natural gas shortages, contend that Order No. 467 is procedurally defective for failure to comply with the Administrative Procedure Act,[3] substantively defective for failure to compile an adequate record, and environmentally defective for failure to comply with the National Environmental Policy Act.[4]
 
 
 6
 We hold that as a general statement of policy, Order No. 467 is exempt from the rulemaking requirements of the Administrative Procedure Act. We further hold that Order No. 467 is not reviewable under section 19(b) of the Natural Gas Act because this general statement of policy does not have a sufficiently immediate and significant impact upon petitioners and because the record in this case is inadequate to permit meaningful judicial review.
 
 I. BACKGROUND
 
 7
 This country appears to be experiencing a natural gas shortage[5] which necessitates the curtailment of supplies to certain customers during peak demand periods. The problem confronting many pipeline companies is whether to curtail on the basis of existing contractual commitments or on the basis of the most efficient end use of the gas. In some instances the pipeline companies are concerned that withholding gas due under existing contracts may subject them to civil liability.
 
 
 8
 Recognizing these uncertainties and mindful of the desirability of providing uniform curtailment regulation,[6] the FPC in 1971 issued a Statement of General Policy in the form of Order No. 431 directing jurisdictional pipeline companies which expected periods of shortages to file tariff sheets containing a curtailment plan.[7] Order No. 431 hinted that curtailment priorities should be based on the end use of the gas and stated that curtailment plans approved by the Commission 'will control in all respects notwithstanding inconsistent provisions in (prior) sales contracts . . ..'[8] In response to Order No. 431, numerous pipeline companies which had not already done so submitted a variety of curtailment plans for the Commission's approval. As could be expected, the curtailment plans reflected a wide range of views as to the proper priorities for delivery. Some plans were based on end use; others, on contract entitlements. The industry was forced to speculate as to which priorities would later be found to be just and reasonable by the Commission, and the absence of any stated Commission policy hindered effective long range planning by pipelines, distributors and consumers.
 
 
 9
 Sensing a need for guidance and uniformity in the curtailment area, on January 8, 1973 the Commission promulgated Order No. 467, the order presently under review, which is reprinted in the Appendix to this opinion. Entitled 'Statement of Policy,' Order No. 467 was issued without prior notice or opportunity for comment. The statement sets forth the Commission's view of a proper priority schedule and expresses the Commission's policy that the national interest would be best served by assigning curtailment priorities on the basis of end use rather than on the basis of prior contractual commitments. Order No. 467 further states the Commission's intent to follow this priority schedule unless a particular pipeline company demonstrates that a different curtailment plan is more in the public interest. On January 15, 1973 the Commission issued Order No. 467-A, 49 F.P.C. 217, which corrected an inadvertent omission in Order No. 467 of procedures to provide for emergency situations that may occur during curtailment periods.
 
 
 10
 The Commission immediately received numerous petitions for rehearing, reconsideration, modification or clarification of Orders Nos. 467 and 467-A, and several parties requested permission to intervene. Most of the petitioners were customers of pipeline companies subject to curtailment, particularly electric generating companies to whom Order No. 467 had assigned a low priority. Few pipeline companies objected to Order No. 467, apparently because the pipelines sell all the gas they can during periods of shortage and consequently are not overly concerned with which customers receive it. On March 2, 1973 the Commission issued Order No. 467-B, 49 F.P.C. 583, which affirmed the policy expressed in Order No. 467, amended that order in some minor instances and otherwise denied the petitions for rehearing and intervention.
 
 
 11
 Petitioners seek review of Order No. 467[9] in this court under section 19(b) of the Natural Gas Act[10] and advance the following three arguments: (1) that Order No. 467 is in effect a substantive rure which the Commission should have promulgated after a rulemaking proceeding under the Administrative Procedure Act (APA);[11] (2) that there is an insufficient factual basis for the priorities announced in Order No. 467; and (3) that the Commission failed to comply with the National Environmental Policy Act.
 
 II. STATEMENTS OF POLICY
 
 12
 The principal issue is whether this court has jurisdiction to review Order No. 467 under section 19(b) of the Natural Gas Act. In resolving this issue it is necessary first to determine whether Order No. 467 is a substantive rule or merely a general statement of policy. We recognize that a decision on the latter question effectively disposes of petitioner's procedural challenge under the APA. However, since many of the same considerations are relevant to both issues, disposition of the APA issue is an unavoidable incident to disposition of the jurisdictional issue.
 
 A. General Principles
 
 13
 The APA requires that before an agency adopts a substantive rule, it must publish a notice of the proposed rule and provide interested persons an opportunity t0 comment. 5 U.S.C. 553. The FPC did not utilize this rulemaking procedure in adopting Order No. 467. However, section 553(b)(A) of the APA provides an exception to the general rulemaking requirements:
 
 
 14
 Except when notice or hearing is required by statute, this subsection does not apply--
 
 
 15
 (A) to interpretative rules, general statements of policy, or rules of agency organization, procedure, or practice; . . ..
 
 
 16
 Id. 553(b)(A).[12] The Commission maintains that Order No. 467 was exempt from the rulemaking requirements because it is a 'general statement of policy' within the meaning of section 553(b)(A).
 
 
 17
 The APA never defines 'general statements of policy' but it does define 'rule' to
 
 
 18
 (mean) the whole or a part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy or describing the organization, procedure, or practice requirements of an agency . . ..
 
 
 19
 Id. 551(4). This broad definition obviously could be read literally to encompass virtually any utterance by an agency, including statements of general policy.[13] But the statutory provision of an exception to the rulemaking requirements for 'general statements of policy' indicates that Congress did not intend the definition of 'rule' to be construed so broadly. Congress recognized that certain administrative pronouncements did not require public participation in their formulation. These types of pronouncements are listed in section 553(b)(A) and include 'general statements of policy.'[14]
 
 
 20
 Professor Davis has described the distinction between substantive rules and general statements of policy as a 'fuzzy product.'[15] Unfortunately the issues in this case compel us to attempt to define the fuzzy perimeters of a general statement of policy.
 
 
 21
 An administrative agency has available two methods for formulating policy that will have the force of law. An agency may establish binding policy through rulemaking procedures by which it promulgates substantive rules, or through adjudications which constitute binding precedents.[16] A general statement of policy is the outcome of neither a rulemaking nor an adjudication; it is neither a rule nor a precedent but is merely an announcement to the public of the policy which the agency hopes to implement in future rulemakings or adjudications.[17] A general statement of policy, like a press release, presages an upcoming rulemaking or announces the course which the agency intends to follow in future adjudications.
 
 
 22
 As an informational device, the general statement of policy serves several beneficial functions. By providing a formal method by which an agency can express its views, the general statement of policy encourages public dissemination of the agency's policies prior to their actual application in particular situations. Thus the agency's initial views do not remain secret but are disclosed well in advance of their actual application. Additionally, the publication of a general statement of policy facilitates long range planning within the regulated industry and promotes uniformity in areas of national concern.
 
 
 23
 The critical distinction between a substantive rule and a general statement of policy is the different practical effect that these two types of pronouncements have in subsequent administrative proceedings. See Columbia Broadcasting System, Inc. v. United States, 316 U.S. 407, 416-417, 62 S.Ct. 1194, 86 L.Ed. 1563 (1942); Public Service Comm'n of New York v. FPC, 126 U.S.App.D.C. 26, 37, 373 F.2d 816, 827 (1967), rev'd on other grounds, 391 U.S. 9, 88 S.Ct. 1526, 20 L.Ed.2d 388 (1968). A properly adopted substantive rule establishes a standard of conduct which has the force of law. In subsequent administrative proceedings involving a substantive rule, the issues are whether the adjudicated facts conform to the rule and whether the rule should be waived or applied in that particular instance. The underlying policy embodied in the rule is not generally subject to challenge before the agency.
 
 
 24
 A general statement of policy, on the other hand, does not establish a 'binding norm.'[18] It is not finally determinative of the issues or rights to which it is addressed. The agency cannot apply or rely upon a general statement of policy as law because a general statement of policy only announces what the agency seeks to establish as policy. A policy statement announces the agency's tentative intentions for the future. When the agency applies the policy in a particular situation, it must be prepared to support the policy just as if the policy statement had never been issued.[19] An agency cannot escape its responsibility to present evidence and reasoning supporting its substantive rules by announcing binding precedent in the form of a general statement of policy.
 
 
 25
 Often the agency's own characterization of a particular order provides some indication of the nature of the announcement. The agency's express purpose may be to establish a binding rule of law not subject to challenge in particular cases. On the other hand the agency may intend merely to publish a policy guideline that is subject to complete attack before it is finally applied in future cases. When the agency states that in subsequent proceedings it will thoroughly consider not only the policy's applicability to the facts of a given case but also the underlying validity of the policy itself, then the agency intends to treat the order as a general statement of policy.[20]
 
 
 26
 Airport Commission v. CAB, 300 F.2d 185 (4th Cir. 1962), provides a good illustration of the proper effect of a general statement of policy in subsequent administrative proceedings. In that case the CAB issued a press release jointly with the Chairman of the FAA stating that it generally favored the rendition of air line service to reasonably adjacent communities through a single airport rather than through separate airports. When the Board later directed consolidated service to a tri-city area in North Carolina, petitioners contended that the Board's decision was illegally based upon a policy pronouncement which was never published in the Federal Register in compliance with the APA. Affirming the Board's decision, the court described the effect of a general statement of policy:
 
 
 27
 (The statement) did not involve a rule which the public is required to obey or with which it is to avoid conflict . . . It was intended as a general statement of policy to guide the public in future planning . . .. The so-called policy or pronouncement did not operate in and of itself to deny any rights to the petitioners.
 
 
 28
 Id. at 188. The court emphasized that the Board's decision under review was firmly grounded upon substantial and extensive record evidence and that the Board had not attempted to apply the policy statement as a rule of law.
 
 
 29
 The tentative effect of a general statement of policy has ramifications in subsequent judicial review proceedings as well as in administrative proceedings. Because a general statement of policy is adopted without public participation, the scope of review may be broader than the scope of review for a substantive rule. The rulemaking process prescribed by the APA insures a thorough exploration of the relevant issues. The public is notified of the proposed rule and interested parties submit arguments supporting their positions. The rulemaking process culminates in the agency applying its experience and expertise to the issues. A court reviewing a rule that was adopted pursuant to this extensive rulemaking process will defer to the agency's judgment if the rule satisfies the minimal criterion of reasonableness.[21]
 
 
 30
 But when an agency promulgates a general statement of policy, the agency does not have the benefit of public exploration of the issues. Judicial review may be the first stage at which the policy is subjected to full criticism by interested parties. Consequently a policy judgment expressed as a general statement of policy is entitled to less deference than a decision expressed as a rule or an adjudicative order. Although the agency's expertise and experience cannot be ignored, the reviewing court has some leeway to assess the underlying wisdom of the policy and need not affirm a general statement of policy that merely satisfies the test of reasonableness.[22]
 
 B. Order No. 467
 
 31
 Applying these general principles to the problem at hand, we conclude that Order No. 467 is a general statement of policy. Order No. 467 is entitled and consistently referred to by the Commission as a general statement of policy.[23] Recognizing the 'need for Commission guidance in curtailment planning,' the Commission announced in Order No. 467 the curtailment policy which it 'proposes to implement,' the 'plan preferred by the Commission' which 'will serve as a guide in other proceedings.' See Appendix. Thus, the stated purpose of Order No. 467 was not to provide an inflexible, binding rule but to give advance notice of the general policy with respect to curtailment priorities that the Commission prefers.
 
 
 32
 Order No. 467 does not establish a curtailment plan for any particular pipeline. The effect of the order is to inform the public of the types of plans which will receive initial and tentative FPC approval, but there is no assurance that any such plan will be finally approved. As the Commission stated:
 
 
 33
 When applied in specific cases, opportunity will be afforded interested parties to challenge or support this policy through factual or legal presentation as may be appropriate in the circumstances presented.
 
 
 34
 49 F.P.C. at 85.
 
 
 35
 (Order No. 467 is) not finally determinative of the rights and duties of a given pipeline, its customers or ultimate consumers; it expressly envisions further proceedings.
 
 
 36
 49 F.P.C. at 585.
 
 
 37
 Many applicants seek clarification of Order No. 467 by Commission definition of all terms used, or modification of the substance of Order No. 467 by a reordering of priorities. These applicants err in treating Oorder Nos. applicants err in treating Order Nos. which precisely defines the curtailment rights and obligations of all pipelines and all pipeline customers. We ascribe no such effect to Order Nos. 467 and 467-A, for, as already stated, these Orders are intended only to state initial guidelines as a means of facilitiating curtailment planning and the adjudication of curtailment cases.
 
 
 38
 49 F.P.C. at 586. Not only will petitioners have an opportunity to challenge the merits of the proposed plan, they will also have an opportunity to demonstrate that the plan is inappropriate in particular circumstances.
 
 
 39
 As discussed below, Order No. 467 is a policy statement and is not intended to initiate a proceeding or to provide a binding rule without further proceedings directed towards curtailment problems on specific pipelines.
 
 
 40
 49 F.P.C. at 583.
 
 
 41
 The stated priorities are intended to be a safe starting point from which deviations may be made based on an evidentiary record.
 
 
 42
 Order Denying Motions for Reconsideration, Clarification or Modification of Order 467-B (April 25, 1973); Jt.App. at 80.
 
 
 43
 We recognized that some flexibility is essential as curtailments first occur, in order to ameliorate the economic dislocations which necessarily ensue, and for that reason we made clear in Order No. 467 that the policy therein stated could, and would, be adjusted in appropriate cases where the hearing record so required.
 
 
 44
 49 F.P.C. at 584.
 
 
 45
 We, of course, recognize that extraordinary circumstances may preclude the strict adherence to the priorities established and, consequently, we will permit those persons who allege that their circumstances require such extraordinary treatment to file petitions for relief under Section 1.7(b) of our Rules of Practice and Procedure. Barring such circumstances, our review of those curtailment proceedings and our knowledge of the industry convinces us that the priorities-of-delivery set forth below should be applied to all jurisdictional pipeline companies during periods of curtailment.
 
 
 46
 49 F.P.C. at 85-86.
 
 
 47
 This does not mean that the parties may not propose or the commission may not adopt variations on the Sec. 2.78(a) plan, but there must be evidence in the record to support any such variations. Nor does it mean that adversely affected pipeline customers may not claim a right to special relief from the operation of a Sec. 2.78(a) plan, but in such instances there must be evidence to support any such claim. In this way, Sec. 2.78(a) will assist the parties and the Administrative Law Judge in arriving at a curtailment plan which will meet the problems created by diverse needs for gas in the face of a nation-wide gas shortage and at the same time be adapted to the peculiarities, if any, of the particular pipeline system involved.
 
 
 48
 49 F.P.C. at 586. Thus it is apparent from Order No. 467 itself that there is no final, inflexible impact upon the petitioners. And since the statement will be applied prospectively, the courts are in a position to police the Commission's application of the policy and to insure that the Commission gives no greater effect to Order No. 467 than the order is entitled to as a general statement of policy.
 
 
 49
 The FPC of course was under no compulsion to issue Order No. 467. The Commission issued the policy statement because the curtailment plans being submitted reflected sharp differences in philosophy which necessitated Commission guidance in the curtailment area. In the absence of such a policy statement, the Commission could have proceeded on an ad hoc basis and tentatively approved curtailment plans filed under section 4 of the Act which the Commission found to be just and reasonable. In following such a course the only difference from the present situation would be that the Commission would be acting under a secret policy rather than under the publicized guidelines of Order No. 467. The argument that an agency must follow rulemaking procedures when it elects to formulate policy by a substantive rule[24] has no application in this case. Order No. 467 does not establish a substantive rule. Although the Commission is free to initiate a rulemaking proceeding to establish a binding substantive rule, the Commission apparently intends to establish its curtailment policies by proceeding through individual adjudications. Order No. 467 merely announces the general policy which the Commission hopes to establish in subsequent proceedings.
 
 
 50
 A comparison of the present case with Columbia Broadcasting System, Inc. v. United States, 316 U.S. 407, 62 S.Ct. 1194, 86 L.Ed. 1563 (1942), provides a good illustration of the difference between a substantive rule and a general statement of policy. After conducting extensive hearings with public participation, the Federal Communications Commission promulgated regulations purporting to require the Commission to refuse to grant or renew a license to any station which entered into certain types of contracts with a chain broadcasting network. Plaintiff, a chain broadcasting network, sued in district court for injunctive relief against the regulation. Although the FCC maintained that the regulations merely announced a general policy and were no more subject to review than a press release similarly announcing policy, id. at 422, 62 S.Ct. 1194, the Supreme Court concluded that the regulations had the effect of a substantive rule and were subject to immediate judicial review.[25]
 
 
 51
 A distinguishing feature of the regulations in Columbia Broadcasting was their immediate and significant impact upon plaintiff's business. There was evidence that the issuance of the regulations caused the immediate cancellation of or failure to renew plaintiff's contracts. These 'wholesale cancellations' seriously disorganized plaintiff's organization and impaired plaintiff's very 'ability to conduct its business.' Id. at 413, 414-415, 418, 423, 62 S.Ct. 1194. The effect of Order No. 467 in the present case is not so direct or immediate. Any abrogation of contractual commitments will occur only after individual curtailment plans have been filed and approved by the Commission. In those proceedings all interested parties can appear, present their case and, if aggrieved, obtain judicial review.[26] Assuming the Commission approves curtailment plans that override some contractual obligations, the result will be that during occasional periods of shortage coupled with high demand, deliveries to some customers rather than others might be curtailed. The possibility that petitioners might receive a lower curtailment priority at some future time as the result of a subsequent tariff filing does not compare with the significant and immediate impact of the regulations in Columbia Broadcasting.
 
 
 52
 A further important distinction between Columbia Broadcasting and the present case is that the FCC regulations in that case had the 'force of law.' Unlike Order No. 467, the FCC regulations were the product of a full rulemaking procedure, see id. at 409, 62 S.Ct. 1194, were 'avowedly' adopted in the exercise of rulemaking power, and were 'couched in terms of command.' There was no assurance that the underlying validity of the regulations could be challenged in subsequent adjudications-- the only issue in future proceedings would be whether a particular contract was within the regulations. Indeed, the FCC acknowledged that the regulations afforded a 'legal basis' for subsequent administrative action. Id. at 417-423, 62 S.Ct. 1194. None of these features are present here. In this case the FPC has consistently viewed Order No. 467 as a general statement of policy and, as discussed at length above, the order does not have the binding force of a substantive rule.
 
 
 53
 Petitioners contend that Order No. 467 has an immediate and significant practical effect by shifting the burden of proof in curtailment cases from the pipeline companies to their customers because the order 'established a presumption that the curtailment rules prescribed are consistent with the Natural Gas Act in any and all situations . . ..'[27] Under section 4 of the Natural Gas Act a pipeline company filing a new curtailment plan has the burden of proving that its plan is reasonable and fair. FPC v. Louisiana Power & Light Co., 406 U.S. 621, 645, 92 S.Ct. 1827, 32 L.Ed.2d 369 (1972); see 15 U.S.C. 717c(e) (1970). Petitioners maintain that by stating that tariffs which conform to the proposed plan will be permitted to become effective, Order No. 467 relieves the pipeline companies of their burden of justifying their plans. However, the language of Order No. 467 is as follows:
 
 
 54
 Proposed tariff sheets which conform to the policies expressed in (Order No. 467) will be accepted for filing, and permitted to become effective, subject to the rights of intervenors to hearing and adjudication of any claim of preference, discrimination, unjustness or unreasonableness of the provisions contained in the proposed tariff sheets, and subject to the further right of anyone adversely affected to seek individualized special relief because of extraordinary circumstances.
 
 
 55
 49 F.P.C. at 585. We interpret the italicized proviso to mean that in appropriate cases the Commission will conduct a section 4 proceeding to consider a challenge to the underlying validity of a curtailment plan, even though the plan conforms to Order No. 467. Section 4 renders unlawful curtailment plans which are preferential, discriminatory, unreasonable or unfair and provides for a hearing concerning the lawfulness of newly filed curtailment plans. See FPC v. Louisiana Power & Light Co., supra at 642-645, 92 S.Ct. 1827. The Commission has processed curtailment plans under section 4 in the past, and the Supreme Court recently emphasized that section 4 is by far the most appropriate mechanism for evaluating such plans. Id. at 643-645, 92 S.Ct. 1827. We expect the Commission generally to continue processing curtailment plans in section 4 proceedings, in which the pipeline company has the burden of proof, and to refrain from treating Order No. 467 as anything more than a general statement of policy.[28]
 
 
 56
 Petitioners rely heavily upon the Third Circuit's decision in Texaco, Inc. v. FPC, 412 F.2d 740 (3rd Cir. 1969). In Texaco the court considered the validity of FPC Order No. 362 which established for the first time a compound interest rate that would be required on amounts ordered refunded when a proposed rate increase was disallowed. The order had been adopted without complying with the APA rulemaking procedures. In deciding that Order No. 362 was not a general statement of policy, the court rejected arguments by the Commission that the order was merely a public announcement of the policy which otherwise would be applied on an ad hoc basis[29] and that the order did not harm the petitioner until a refund was actually required. According to the Texaco court, the petitioner's burden of overcoming the general rule embodied in Order No. 362 was evidence of the substantive nature of the order.[30]
 
 
 57
 The situation in Texaco was quite different from the present case. Texaco arose in part from an adjudication in which the Commission had refused to waive Order No. 362 as a substantive rule. Since the inception of Order No. 362 the Commission had treated it as a substantive rule. Indeed, the order itself stated that 'the amendments herein prescribed may be interpreted as substantive amendments under 553 of Title 5 of the United States Code . . ..' 412 F.2d at 742 & n. 4. The Commission had maintained that section 553(b)(B) of the APA[31] made a rulemaking procedure unnecessary because Order No. 362 was minor, routine, insignificant and unimportant, and it was only on appeal that the Commission suggested for the first time that the order was excused from rulemaking under section 553(b)(A) as a general statement of policy. Id. at 743, 744 n. 9. Under these circumstances, and having just concluded that Order No. 362 was not minor, routine, insignificant or unimportant, the court was unwilling to treat the order as a general statement of policy without substantive effect.
 
 
 58
 Order No. 467 is not the first instance where the FPC has utilized a general statement of policy to advise the public of the manner in which it intends to regulate the natural gas industry. For example, after the Supreme Court held in Phillips Petroleum Co. v. Wisconsin, 347 U.S. 672, 74 S.Ct. 794, 98 L.Ed. 1035 (1954), that the Commission's jurisdiction extends to independent producers of natural gas, the Commission promulgated a 'Statement of General Policy' which tentatively designated various geographic areas as producing units for the purpose of rate regulation and established maximum rates for each area. 24 F.P.C. 818 (1960). This statement provided that rates exceeding the maximum levels would not be approved and announced that the tentative rates would remain in effect until final rates and geographic boundaries were determined in future proceedings. Id. at 820. The first of the future proceedings to be completed culminated in the landmark Supreme Court decision in Permian Basin Area Rate Cases, 390 U.S. 747, 88 S.Ct. 1344, 20 L.Ed.2d 312 (1968). Order No. 467 is similar in both purpose and effect to the general statement of policy which led to the area rate structure adjudicated in the Permian case.
 
 
 59
 We conclude that Order No. 467 is a general statement of policy and that it was therefore unnecessary for the Commission to conduct rulemaking proceedings under the Administrative Procedure Act.
 
 III. JURISDICTION
 
 60
 Having concluded that Order No. 467 is a general statement of policy, we must now decide whether this court has jurisdiction to review the order. Although circumstances might arise under which a general statement of policy is subject to immediate judicial review,[32] Order No. 467 does not present such a situation.
 
 
 61
 Petitioners contend that we have jurisdiction to review Order No. 467 under section 19(b) of the Natural Gas Act, 15 U.S.C. 717r(b) (1970), which provides:
 
 
 62
 Any party to a proceeding under this chapter aggrieved by an order issued by the commission in such proceeding may obtain a review of such order in the court of appeals of the United States for any circuit wherein the natural-gas company to which the order relates is located or has its principal place of business, or in the United States Court of Appeals for the District of Columbia, by filing in such court, within sixty days after the order of the Commission upon the application for rehearing, a written petition praying that the order of the Commission be modified or set aside in whole or in part.[33]
 
 
 63
 Under this statute this court has jurisdiction only where there is a 'party to a proceeding' who is 'aggrieved by an order.'
 
 
 64
 The Commission first contends that petitioners were not 'parties' to a proceeding before the Commission because petitioners' only involvement with Order No. 467 was the filing of petitions for rehearing. The Commission argues that for petitioners to have been 'parties' to the proceeding, it was necessary to file petitions to intervene. Whatever merit the Commission's argument may have in another context,[34] in the present case petitioners need not have requested intervention. The Commission actually denied one request for intervention. Moreover, the Commission stated:
 
 
 65
 Order No. 467 is a policy statement . . .. Therefore petitions to intervene are unnecessary, and petitions for rehearing do not lie. We treat the filings as petitions for reconsideration and deny the same.
 
 
 66
 49 F.P.C. at 583. In light of this statement by the Commission, it was unnecessary to file futile petitions to intervene in order to become 'parties' to the proceeding. It was sufficient for petitioners to file petitions for rehearing.
 
 
 67
 The Commission further contends that Order No. 467 is not sufficiently definitive to be a reviewable 'order' under section 19(b). This argument finds support in a line of decisions beginning with United Gas Pipeline Co. v. FPC, 86 U.S.App.D.C. 314, 181 F.2d 796, cert. denied, 340 U.S. 827, 71 S.Ct. 63, 95 L.Ed. 607 (1950). In that case, after conducting a formal rulemaking, the FPC promulgated a rule that pipeline companies must file their rates in tariff-schedule form instead of as percentage contracts. We held that the rule was not 'a decision based on evidence presented in a quasi-judicial proceeding before the Commission,' and hence not a reviewable 'order' under section 19(b) because the record compiled during the rulemaking proceedings was insufficient to permit meaningful review.[35] For example, the central question was the effect the rule would have upon petitioner's contracts, but none of the contracts appeared in the record before the court.[36]
 
 
 68
 In administrative law the phrase 'quasi-judicial' generally describes a proceeding which at least in part involves an adjudication of specific facts relating to particular parties.[37] By limiting judicial review to orders arising from 'quasi-judicial' administrative proceedings, the United Gas Pipeline decision seemed to distinguish adjudicative orders from all other agency pronouncements. For a while the courts followed United Gas Pipeline's apparent interpretation of section 19(b) allowing judicial review only of orders arising from adjudicative proceedings.[38] However, in recent years the courts have been more inclined to accept jurisdiction over rules as well as adjudicative orders, and our decision in United Gas Pipeline has been repeatedly questioned.[39]
 
 
 69
 We thoroughly discussed the United Gas Pipeline decision in Chicago v. FPC, 147 U.S.App.D.C. 312, 458 F.2d 731 (1971), cert. denied, 405 U.S. 1074, 92 S.Ct. 1495, 31 L.Ed.2d 808 (1972). In Chicago, the FPC promulgated an order directing that certain gas produced by natural gas pipeline companies should be valued at the area rate applicable to independent producers. The issue had arisen in an adjudicative proceeding but the FPC recognized the potential importance of the issue and enlarged the proceeding to a rule-making which complied fully with the APA rulemaking requirements.[40] The Commission argued that the court lacked jurisdiction to review the order under the United Gas Pipeline interpretation of section 19(b). However, analyzing the United Gas Pipeline decision, we concluded that the distinction between rulemaking and adjudication was not dispositive of the jurisdictional issue. We there said that the 'determining factor' was whether the record was sufficient to allow meaningful review, and since the Commission had compiled a 'full and complete evidentiary record of extensive hearings,' we accepted jurisdiction under section 19(b). Id. at 321-322; 458 F.2d at 740-741. We also emphasized the 'controlling nature of the rule, the predominantly legal nature of the questions presented (and) the necessity for swift determination of the questions involved . . .,' and held the rule final 'for all practical purposes' even though the rule was yet to be enforced in an adjudication. Id. at 321 n. 43; 458 F.2d at 740 n. 43.
 
 
 70
 The effect of the Chicago decision is virtually to eliminate the arbitrary distinction which United Gas Pipeline seemed to have erected between adjudicative orders and other agency pronouncements. In place of that distinction, the Chicago decision employed a more practical analysis, concentrating on whether the issues and the record were suitable for judicial review and whether the agency's order had an immediate and significant impact upon the petitioners. This analysis incorporates substantially the same factors as those enunciated by the Supreme Court for determining the appropriateness of preenforcement review of agency action by a suit for injunctive and declaratory relief. See Abbott Laboratories v. Gardner, 387 U.S. 136, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967); Toilet Goods Ass'n, Inc. v. Gardner, 387 U.S. 158, 87 S.Ct. 1520, 18 L.Ed.2d 697 (1967); Gardner v. Toilet Goods Ass'n, Inc., 387 U.S. 167, 87 S.Ct. 1526, 18 L.Ed.2d 704 (1967). In those cases the Supreme Court adopted a twofold analysis for determining whether an administrative announcement is final and ripe for judicial review. A court must 'evaluate both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration.'[41] We find these factors to be equally applicable and persuasive in determining whether petitioners are 'aggrieved by an order' within the meaning of section 19(b) of the Natural Gas Act.[42]
 
 
 71
 The extensive discussion in section II(b) of this opinion demonstrates that Order No. 467 does not have an immediate and significant impact upon petitioners. As a general statement of policy, the order merely announces the tentative curtailment policy which the Commission considers to be 'just and reasonable, nondiscriminatory and nonpreferential.' 49 F.P.C. at 486. It is the policy which the Commission hopes to apply in future proceedings but there is no assurance that this specific policy will be imposed on all pipelines and their customers. Thus petitioners will not suffer undue hardship if judicial review is denied.
 
 
 72
 Moreover, the issues raised by petitioners are not suitable for judicial review at this time. Petitioners contend that the curtailment priorities of Order No. 467 were formulated without factual support in the record and that implementation of Order No. 467 will unlawfully fully abrogate existing contracts. Judicial review of these issues would be difficult if not impossible to review on the record before us. There is nothing here like the 'full and complete evidentiary record of extensive hearings' which was before the court in the Chicago case. Although evidentiary hearings are not always a prerequisite to judicial review,[43] the petitions for rehearing filed before the Commission in this case do not constitute a sufficient record to resolve petitioner's challenges to Order No. 467. Indeed, the very contracts which petitioners allege will be abrogated are not in the record.[44]
 
 
 73
 Since Order No. 467 has no immediate and significant impact upon the petitioners and since the record would not permit meaningful review of the issues, the present case fails to satisfy either of the criteria necessary for judicial review under section 19(b). Without jurisdiction over the order, we are precluded from considering the other issues in this case. Thus we do not decide whether the FPC violated the National Environmental Policy Act, 42 U.S.C. 4332 (1970), when it promulgated Order No. 467. In American Smelting & Refining Co. v. FPC, 161 U.S.App.D.C. 6 at 28-30, 494 F.2d 925, 947-949 (1974) we held that an environmental impact statement need not accompany an interim emergency curtailment plan. However, the FPC recognizes its duty to prepare an impact statement at least when it approves a final permanent curtailment plan. Id. at 6, 494 F.2d at 925.
 
 
 74
 In this appeal the FPC brief contends that it was unnecessary for an environmental impact statement to accompany Order No. 467 because a general statement of policy does not have a direct environmental impact. Cf. First Nat'l Bank of Homestead v. Watson, 363 F.Supp. 466, 472-475 (D.D.C.1973). Petitioners contend that an impact statement should have accompanied the general statement of policy, see Jones v. District of Columbia Redevelopment Land Agency, 162 U.S.App.D.C. 366, 499 F.2d 502 (1974); Scientists' Institute for Public Information, Inc. v. AEC, 156 U.S.App.D.C. 395, 481 F.2d 1079 (1973), or in the alternative that the FPC at least should have explained why an impact statement was not required, see Arizona Public Service Co. v. FPC, 157 U.S.App.D.C. 263, 483 F.2d 1274 (1973). Since we lack jurisdiction over Order No. 467, petitioners are free to pursue their NEPA claims in the district court. See Atlanta Gas Light Co. v. Southern Natural Gas Co., 338 F.Supp. 1039, 1050 (N.D.Ga.1972), modified on other grounds sub nom. Atlanta Gas Light Co. v. FPC, 476 F.2d 142 (5th Cir. 1973).
 
 
 75
 The petitions for review are therefore dismissed.
 
 
 76
 Judgment accordingly.
 
 APPENDIX
 ORDER NO. 467
 STATEMENT OF POLICY
 
 77
 This order contains a statement of policy by the Commission on priorities-of-deliveries by jurisdictional pipeline companies during periods of curtailment. The Commission proposes to implement such policy in all matters arising under the Natural Gas Act.
 
 
 78
 When applied in specific cases, opportunity will be afforded interested parties to challenge or support this policy through factual or legal presentation as may be appropriate in the circumstances presented. It is the Commission's intention in this statement to focus the attention of all parties concerned with the natural gas industry upon the general policy views of the Commission in advance of the filing of particular applications with the Commission and hereby to permit affected entities the opportunity to evolve a rational energy resource development program considering national energy goals and objectives as they may be stated from time-to-time, and to minimize the complexity and length of administrative proceedings before this Commission.
 
 
 79
 Concurrently, the Commission is issuing, in Docket No. R-467, Utilization and Conservation of Natural Resources-- Natural Gas, a notice of proposed policy statement pertaining to the priorities of usage of our natural gas supply. In this notice, we discussed the critical shortage of natural gas supply and its effect on this Nation's progress. We then found that it was necessary to promulgate procedures that would maximize high priority of usage for this natural resource. We adopt that discussion here and find, based on that analysis, that procedures should be adopted to maximize the high priority usage of natural gas during curtailment periods on a pipeline's system.
 
 
 80
 General Discussion-- As stated in that notice, the Commission has been called upon to determine the propriety of curtailment procedures to be invoked by jurisdictional pipeline companies during periods of curtailed deliveries. In reaching its decisions, the Commission has reviewed the records in those proceedings and, based upon those reviews, has concluded that the customers' use of the natural gas fall into certain set categories. Accordingly, we believe that those categories are generally applicable industry-wide and can be utilized for establishing priorities-of-delivery during periods of short supply on any jurisdictional pipeline's system. We, of course, recognize that extraordinary circumstances may preclude the strict adherence to the priorities orities established and, consequently, we will permit those persons who allege that their circumstances require such extraordinary treatment to file petitions for relief under Section 1.7(b) of our Rules of Practice and Procedure. Barring such circumstances, our review of those curtailment proceedings and our knowledge of the industry convinces us that the priorities-of-delivery set forth below should be applied to all jurisdictional pipeline companies during periods of curtailment.
 
 
 81
 The curtailment procedures to be followed must have as their basic objective the protection of deliveries for the residential and small volume consumers who cannot be safely curtailed on a daily basis and requiring, as the initial level of curtailment, reduction in deliveries for large volume interruptible sales. As we pointed out in our Ark-La decision[45] issued concurrently herewith (supra, pp. 66-67):
 
 
 82
 We are impelled to direct curtailment on the basis of end use rather than on the basis of contract simply because contracts do not necessarily serve the public interest requirement of efficient allocation of this wasting resource. In time of shortage, performance of a firm contract to deliver gas for an inferior use, at the expense of reduced deliveries for priority uses, is not compatible with consumer protection.
 
 
 83
 Secondly, we have determined that interruptible sales are for the most part, predicated on end-use considerations; those customers, be they direct sales or indirect sales, who require gas for human needs service or nonsubstitutable industrial service do not contract on an interruptible basis. Interruptible service, at the lower rates charged for such service, envisions interruption. And accordingly, interruptible customers can most reasonably be expected to have alternate fuel facilities already operational. We conclude, therefore, that durtailment should first fall on those who have not historically borne the full-fixed costs of providing gas service, particularly since these customers are best prepared to accept interruptions in service and clearly do not require uninterrupted service for protection of life or property.
 
 
 84
 Finally, if curtailment reaches beyond the level of interruptible service into firm contract service, we commit ourselves to the proposition that large volume boiler fuel usage is inferior and should be curtailed before other firm service. Aside from the established physical fact that combustion of natural gas for raising steam in boilers and its subsequent conversion into electricity or mechanical energy results in a loss of roughly two-thirds of the heating value of the gas used-- which we regard as unacceptably inefficient in time of shortage-- we note also that those who use gas as boiler fuel generally can substitute other fuels more readily and at lower overall cost than other gas users; additionally, pollution control is more practical because of the large size of individual installations. Other fuels generally can be physically substituted in large boiler fuel applications with less inconvenience and less possible adverse consequences than in other industrial applications, such as direct fired uses, and other uses demanding precise temperature control, flame characteristics, instantaneous response and atmosphere quality. Finally, subordinating boiler fuel use with its comparative ease of substitutability, to other large scale industrial and commercial uses should tend to minimize plant and business closings and the attendant economic loss from decreased production and payrolls, and the personal hardships of unemployment.
 
 
 85
 In establishing the priorities-of-service for the use of the natural gas supply, it is obvious that some direct and indirect customers use their supply of natural gas for similar end-use purposes. Customers with similar usages for the fuel should be accorded the same treatment to avoid any undue discrimination or preference among them. Accordingly, we will place the direct and indirect customers in the same priority-of-service position when their use of natural gas is comparable.
 
 
 86
 In determining our priority-of-service listing, we are cognizant of the economic impacts that will flow from that listing. However, we believe that we have no choice but to impose certain restrictions on the sale of natural gas within the limits of our jurisdiction during this time of supply shortages. Our decision is made with full knowledge that certain sales to ultimate consumers are beyond our jurisdiction. In those instances, we solicit the cooperation of State authorities to aid implementation of this program.
 
 The Commission finds:
 
 87
 (1) The notice and effective date provisions of 5 U.S.C. 553 do not apply with respect to the policy statement here adopted.
 
 
 88
 (2) It is appropriate and in the public interest in administering the Natural Gas Act to adopt the policy statement as herein ordered.
 
 
 89
 The Commission, acting pursuant to the provisions of the Natural Gas Act, as amended, particularly Sections 4, 5 and 7 (52 Stat. 822, 823, 824, 825; 56 Stat. 83, 84; 61 Stat. 459; 76 Stat. 72; 15 U.S.C. 717c, 717d, 717f), orders:
 
 
 90
 (A) Part 2 of the Commission's General Rules of Practice and Procedure, General Policy and Interpretations, Subchapter A, Chapter I, Title 18 of the Code of Federal Regulations is amended by adding new Section 2.78(a) as follows: (The following 2.78(a) includes the amendments made by Orders Nos. 467-A and 467-B.)
 
 
 91
 2.78 Utilization and Conservation of Natural Resources-- Natural Gas
 
 
 92
 (a) The national interests in the development and utilization of natural gas resources throughout the United States will be served by recognition and implementation of the following priority-of-service categories for use during periods of curtailed deliveries by jurisdictional pipeline companies:
 
 
 93
 (1) Residential, small commercial (less than 50 Mcf on a peak day).
 
 
 94
 (2) Large commercial requirements (50 Mcf or more on a peak day), firm industrial requirements for plant protection, feedstock and process needs, and pipeline customer storage injection requirements.
 
 
 95
 (3) All industrial requirements not specified in (2), (4), (5), (6), (7), (8), or (9).
 
 
 96
 (4) Firm industrial requirements for boiler fuel use at less than 3,000 Mcf per day, but more than 1,500 Mcf per day, where alternate fuel capabilities can meet such requirements.
 
 
 97
 (5) Firm industrial requirements for large volume (3,000 Mcf or more per day) boiler fuel use where alternate fuel capabilities can meet such requirements.
 
 
 98
 (6) Interruptible requirements of more than 300 Mcf per day, but less than 1,500 Mcf per day, where alternate fuel capabilities can meet such requirements.
 
 
 99
 (7) Interruptible requirements of intermediate volumes (from 1500 Mcf per volumes (from 1,500 Mcf per day through 3,000 Mcf per day), where requirements.
 
 
 100
 (8) Interruptible requirements of more than 3,000 Mcf per day, but less than 10,000 Mcf per day, where alternate fuel capabilities can meet such requirements.
 
 
 101
 (9) Interruptible requirements of more than 10,000 Mcf per day, where alternate fuel capabilities can meet such requirements.
 
 
 102
 The priorities-of-deliveries set forth above will be applied to the deliveries of all jurisdictional pipeline companies during periods of curtailment on each company's system; except, however, that, upon a finding of extraordinary circumstances after hearing initiated by a petition filed under Section 1.7(b) of the Commission's Rules of Practice and Procedure, exceptions to those priorities may be permitted.
 
 
 103
 The above list of priorities requires the full curtailment of the lower priority category volumes to be accomplished before curtailment of any higher priority volumes is commenced. Additionally, the above list requires both the direct and indirect customers of the pipeline that use gas for similar purposes to be placed in the same category of priority.
 
 
 104
 The tariffs filed with this Commission should contain provisions that will reflect sufficient flexibility to permit pipeline companies to respond to emergency situations (including environmental emergencies) during periods of curtailment where supplemental deliveries are required to forestall irreparable injury to life or property.
 
 
 105
 (B) The amendment provided for herein shall be effective as of the date of issuance of this order.
 
 
 106
 (C) The Secretary shall cause prompt publication of this order to be made in the Federal Register.
 
 
 
 *
 Sitting by designation pursuant to 28 U.S.C. 294(d)
 
 
 [1]
 Natural Gas Act of 1938, ch. 556 19(b), 52 Stat. 831, 15 U.S.C. 717r(b) (1970)
 
 
 [2]
 The petitions for review encompass Order No. 467-A, 49 F.P.C. 217 (January 15, 1973) and Order No. 467-B, 49 F.P.C. 583 (March 2, 1973). Order No. 467, as amended by Orders Nos. 467-A and 467-B, is reprinted in the Appendix to this opinion
 
 
 [3]
 5 U.S.C. 551 et seq. (1970)
 
 
 [4]
 42 U.S.C. 4321 et seq. (1970); see text at 33-34 infra
 
 
 [5]
 Mobil Oil Corp. v. FPC, 417 U.S. 283, 331, 94 S.Ct. 2328, 41 L.Ed.2d 72 (1974); FPC v. Louisiana Power & Light Co., 406 U.S. 621, 626 & n. 2, 92 S.Ct. 1827, 32 L.Ed.2d 369 (1972); American Smelting & Refining Co. v. FPC, 161 U.S.App.D.C. 6, 11, 494 F.2d 925, at 930 n. 3 (1974)
 
 
 [6]
 See FPC v. Louisiana Power & Light Co., 406 U.S. 621, 634-635, 92 S.Ct. 1827, 32 L.Ed.2d 369 (1972)
 
 
 [7]
 45 F.P.C. 570 (1971). In FPC v. Louisiana Power & Light Co., 406 U.S. 621, 92 S.Ct. 1827, 32 L.Ed.2d 369 (1972), the Supreme Court upheld the FPC's authority to effect orderly curtailment plans for both direct sales and sales for resale. The decision notes the existence of Order No. 431
 
 
 [8]
 45 F.P.C. at 572. Subsequent to Order No. 431 the Commission indicated its view that an approved curtailment plan 'would be an absolute defense . . . against all claims . . . that may be initiated in the courts.' United Gas Pipeline Co., 46 F.P.C. 786, 805 (1971). In Order No. 467-B the Commission stated:
 In situations where the need to curtail arises suddenly and without anticipation, and where no curtailment plan has been approved, . . . the pipeline is placed in the difficult position of undertaking service cutbacks at the risk of civil liability to direct and indirect customers if the curtailments are not required by Commission order, or if the pattern of curtailment is later adjudicated to be unjust or unreasonable.
 
 
 [49]
 F.P.C. at 584. Since the issue is not before us, we express no opinion on the question of immunity from civil liability. See generally American Smelting & Refining Co. v. FPC, 161 U.S.App.D.C. 6, at 16 (1974), 494 F.2d 925 at 935 n. 14 (1974); Atlanta Gas ight Co. v. FPC, 476 F.2d 142, 151-152 & n. 8 (5th Cir. 1973); International Paper Co. v. FPC, 476 F.2d 121, 126 & n. 5 (5th Cir. 1973)
 
 
 [9]
 Petitions for review encompass Orders Nos. 467, 467-A and 467-B. Throughout this opinion these orders are referred to collectively as Order No. 467 unless otherwise necessary for clarity
 
 
 [10]
 Note 33 infra and accompanying text
 
 
 [11]
 5 U.S.C. 551 et seq. (1970)
 
 
 [12]
 See also 5 U.S.C. 553(d)(2), which excepts 'statements of policy' from the requirement that substantive rules be published or served 30 days before their effective date
 
 
 [13]
 See Columbia Broadcasting System, Inc. v. United States, 316 U.S. 407, 422, 62 S.Ct. 1194, 86 L.Ed. 1563 (1942); 1 K. Davis, Administrative Law Treatise 5.02, at 294-295 (1958); Parker, The Administrative Procedure Act: A Study in Overestimation, 60 Yale L.J. 581, 597 (1951)
 
 
 [14]
 Section 553(b)(A) also excludes 'interpretative rules' from the rulemaking requirements. Interpretative rules and similar in some respects to general statements of policy. An interpretative rule expresses the agency's view of what another rule, regulation or statute means. National Ass'n of Ins. Agents, Inc. v. Board of Governors of the Fed. Reserve Sys., 160 U.S.App.D.C. 144, 146, 489 F.2d 1268, 1270 (1974); American President Lines, Ltd v. FMC, 114 U.S.App.D.C. 418, 316 F.2d 419 (1963); Garelick Mfg. Co. v. Dillon, 114 U.S.App.D.C. 218, 313 F.2d 899 (1963); 1 K. Davis, supra note 13, 5.03-5.04; Bonfield, Some Tentative Thoughts on Public Participation in the Making of Interpretative Rules and General Statements of Policy under the A.P.A., 23 Ad.L.Rev. 101, 108 (1971). The agency's announced interpretation is usually followed until it is overruled by a court, but the scope of judicial review is broad because the interpretation of statutory language does not involve the agency's discretion. 1 K. Davis, supra note 13, 5.03 at 300-01; K. Davis, supra note 13, 5.04 at 253-55 (Supp.1970); Note, Rulemaking: Some Definitions under the Federal Administrative Procedure Act, 35 Geo.L.J. 491, 496-97 & n. 23 (1947)
 
 
 [15]
 1 K. Davis, supra note 13, 5.01 at 290
 
 
 [16]
 E.g., FPC v. Texaco, Inc., 377 U.S. 33, 39-41, 44, 84 S.Ct. 1105, 12 L.Ed.2d 112 (1964); SEC v. Chenery Corp., 332 U.S. 194, 202-203, 67 S.Ct. 1575, 91 L.Ed. 1995 (1947)
 17 U.S. Dep't of Justice, Attorney General's Manual on the Administrative Procedure Act 30 n. 3 (1947); Bonfield, supra note 14, at 113-17; Parker, supra note 13, at 598. The Attorney General's Manual, supra, offers the following definition:
 General Statements of policy-- statements issued by an agency to advise the public prospectively of the manner in which the agency proposes to exercise a discretionary power.
 The Attorney General's Manual is entitled to considerable weight because of the very active role that the Attorney General played in the formulation and enactment of the APA.
 
 
 [18]
 Parker, supra note 13, at 598
 
 
 [19]
 A general statement of policy, however, may not be irrelevant for all purposes. For example, a policy statement establishing initial guideline prices may have some relevance in determining cost trends. FPC v. Sunray DX Oil Co., 391 U.S. 9, 28-29, 88 S.Ct. 1526, 20 L.Ed.2d 388 (1968)
 
 
 [20]
 See Columbia Broadcasting System, Inc. v. United States, 316 U.S. 407, 62 S.Ct. 1194, 86 L.Ed. 1563 (1942); Texaco, Inc. v. FPC, 412 F.2d 740, 742, 744 n. 8 (3d Cir. 1969). In Columbia Broadcasting, although the Court stated that 'the particular label placed upon (the order) by the Commission is not necessarily conclusive . . .,' the Court relied heavily upon the form of certain FCC regulations in holding that they were substantive rules subject to judicial review. See text at 19 infra. In Texaco the court held that a certain FPC order could not be considered a general statement of policy, noting that the agency had referred to the order as a 'substantive amendment' and had not included the order in the agency's compilation of 'Statements of General Policy and Interpretations.' See text at 23-24 infra. Thus the agency's description of the order is some evidence of its true character
 
 
 [21]
 E.g., Mobil Oil Corp. v. FPC, 152 U.S.App.D.C. 119, 129, 469 F.2d 130, 140 (1972), cert. denied, 412 U.S. 931, 93 S.Ct. 2749, 37 L.Ed.2d 159 (1973)
 
 
 [22]
 This discussion of the scope of judicial review assumes that a situation could arise where a court has jurisdiction to review a general statement of policy. See note 32 infra and accompanying text. Since we hold that the policy enunciated in Order No. 467 is not subject to judicial review at this time, we express no opinion on the wisdom of that policy
 
 
 [23]
 See note 20 supra and accompanying text. Order No. 467 was placed in Part 2 of the Commission's General Rules of Practice and Procedure entitled 'General Policy and Interpretations.' Compare Texaco, Inc. v. FPC, 412 F.2d 740, 744 n. 8 (3d Cir. 1969)
 
 
 [24]
 See Columbia Broadcasting System, Inc. v. United States, 316 U.S. 407, 421, 62 S.Ct. 1194, 86 L.Ed. 1563 (1942); Texaco, Inc. v. FPC, 412 F.2d 720, 744-745 (3d Cir. 1969)
 
 
 [25]
 The issues before the Supreme Court were whether the regulations constituted a reviewable 'order' under section 402(a) of the Federal Communications Act of 1934, 48 Stat. 1093, and if so, whether plaintiff had stated a cause of action in equity. 316 U.S. at 415, 62 S.Ct. 1194. The case arose prior to the enactment of the APA, and while the Court's holding was limited to determining the district court's jurisdiction, the treatment of the issues is helpful in understanding the difference between a rule and a general statement of policy under the APA. See 1 K. Davis, supra note 13, 5.01 at 289-290
 
 
 [26]
 In curtailment cases involving pipelines that serve them both Pacific Gas and Electric Company (PG & E) and Mississippi Power & Light Company (MP & L) may introduce evidence supporting their contentions that deviations from the priorities of service enumerated in Section 2.78(a) is required. Should they fail to agree with the Commission's resolutions of these cases, the companies may properly seek review thereof under Section 19(b) of the Natural Gas Act
 Brief for Respondent FPC at 17. The Commission's brief contains additional representations to the same effect. E.g., id. at 33.
 
 
 [27]
 Brief for Petitioners Pacific Gas & Electric Co. at 19
 
 
 [28]
 Our interpretation of Order No. 467 is supported by the Commission's action in Transwestern Pipeline Co., 50 F.P.C. 343 (No. RP73-101, decided Aug. 1, 1973). In that case the Commission approved a curtailment plan filed by Transwestern. Several parties filed petitions for rehearing and requested a section 4 hearing to determine the lawfulness of the plan. The Commission denied the petitions and refused to conduct a section 4 hearing. However, the Commission did not say that a plan conforming to Order No. 467 was not subject to challenge in a section 4 hearing. Rather, the Commission held only that petitioners had not raised an appropriate challenge to the underlying validity of Transwestern's plan
 While Petitioners broadly allege the impropriety of the order of priorities established by Transwestern's filing, their concern appears to be directed more to their position on the priority scale than urging the impropriety of the priorities themselves. * * * Accordingly, the need to initiate a Section 4 hearing to determine the lawfulness of the priorities per se has not been demonstrated.
 Since the Transwestern case is not before us and we are not familiar with the facts of that case, we are unable to say whether the particular challenges raised by petitioners in Transwestern were in fact appropriate for a section 4 hearing.
 In view of the nature of the issues in Transwestern, the Commission instituted a proceeding under section 5 of the Natural Gas Act, 15 U.S.C. 717d, in which the party challenging the curtailment plan would have the burden of demonstrating that the plan was unreasonable. Petitioners seize on this aspect of the Transwestern case to illustrate their contention that the Commission intends in the future to shift the burden by using section 5 instead of section 4 to adjudicate the lawfulness of curtailment plans. But in the Transwestern case, having explained that the issues in that case were inappropriate for a section 4 proceeding, the Commission decided that the issues were appropriate for a section 5 hearing and ordered a section 5 hearing although not specifically requested by the parties. We do not view this action as manifesting an intent to proceed invariably under section 5. Indeed, the Commission's opinion in Transwestern implicitly recognizes the appropriateness of 'a Section 4 hearing to
 determine the lawfulness of the priorities per se . . ..' The Supreme Court itself has emphasized the need for section 4 evaluation of curtailment plans and has gone so far as to state that a '5(a) procedure has substantial disadvantages . . . rendering it unsuitable for the evaluation of curtailment plans.' FPC v. Louisiana Power & Light Co., 406 U.S. 621, 643, 92 S.Ct. 1827, 1840, 32 L.Ed.2d 369 (1972).
 For a discussion of the type of proceeding required for rate-making under section 4, see Mobil Oil Corp. v. FPC, 157 U.S.App.D.C. 235, 254, 483 F.2d 1238, 1257-1263 (1973).
 
 
 [29]
 The Commission contends that the new amendment does not impose any burden 'upon the persons affected thereby that may not now be imposed upon them by ad hoc orders in each case initiated pursuant to 4(e) of the Natural Gas Act, whereby a suspended rate becomes effective subject to refund at the expiration of the period of suspension.' However, the crucial fact is that the Commission elected to proceed in this case by making a general rule and, when engaged in rule-making, it must comply with the procedural requirements imposed on rule-making by the Administrative Procedure Act, which it failed to do in promulgating Order No. 362
 412 F.2d at 744-745. A further discussion of this argument appears at note 24 supra and accompanying text.
 
 
 [30]
 Respondent contends that Texaco is not harmed as far as refunds incident to these pending rates are concerned until it may be ultimately determined that the pending rate changes are not lawful. We believe that Texaco is harmed by being faced with such a general rule which it must overcome in any ad hoc waiver proceeding . . .. In filing a waiver application, an operator is entitled to be confronted only with rules adopted in the procedural manner prescribed by Congress
 412 F.2d at 745-746.
 
 
 [31]
 5 U.S.C. 553(b)(B) (1970). This section provides an exception to the rulemaking requirements:
 (B) when the agency for good cause finds (and incorporates the finding and a brief statement of reasons therefor in the rules issued) that notice and public procedure thereon are impracticable, unnecessary, or contrary to the public interest.
 
 
 [32]
 Under certain circumstances interpretative rules, which are similar in some respects to general statements of policy, may be judicially reviewed before they are actually applied. See National Ass'n of Ins. Agents, Inc. v. Board of Governors of the Fed. Reserve Sys., 160 U.S.App.D.C. 144, 147, 489 F.2d 1268, 1271 (1974); K. Davis, supra note 13, 5.03 at 249-250 (Supp.1970)
 
 
 [33]
 The statute further provides:
 A copy of such petition shall forthwith be transmitted by the clerk of the court to any member of the Commission and thereupon the Commission shall file with the court the record upon which the order complained of was entered, as provided in section 2112 of Title 28. Upon the filing of such petition such court shall have jurisdiction, which upon the filing of the record with it shall be exclusive, to affirm, modify, or set aside such order in whole or in part. No objection to the order of the Commission shall be considered by the court unless such objection shall have been urged before the Commission in the application for rehearing unless there is reasonable ground for failure so to do. The finding of the Commission as to the facts if supported by substantial evidence, shall be conclusive. If any party shall apply to the court for leave to adduce additional evidence, and shall show to the satisfaction of the court that such additional evidence is material and that there were reasonable grounds for failure to adduce such evidence in the proceedings before the Commission, the court may order such additional evidence to be taken before the Commission and to be adduced upon the hearing in such manner and upon such terms and conditions as to the court may seem proper. The Commission may modify its findings as to the facts by reason of the additional evidence so taken, and it shall file with the court such modified or new findings, which if supported by substantial evidence, shall be conclusive, and its recommendation, if any, for the modification or setting aside of the original order. The judgment and decree of the court, affirming, modifying, or setting aside, in whole or in part, any such order of the Commission, shall be final, subject to review by the Supreme Court of the United States upon certiorari or certification as provided in sections 346 and 347 of Title 28.
 15 U.S.C. 717r(b) (1970).
 
 
 [34]
 Compare Wisconsin v. FPC, 110 U.S.App.D.C. 260, 261-262 & nn. 1, 2, 292 F.2d 753, 754-755 & nn. 1, 2 (1961) (petition for rehearing does not make petitioners parties to a proceeding) with Texaco, Inc. v. FPC, 412 F.2d 740, 742 (3d Cir. 1969) (accepted jurisdiction under 19(b) where petitioner's only involvement was an application for rehearing). See also Gage v. AEC, 156 U.S.App.D.C. 231, 234-236, 479 F.2d 1214, 1217-1219 (1973)
 
 
 [35]
 86 U.S.App.D.C. at 316-317, 181 F.2d at 798-799. In FPC v. Metropolitan Edison Co., 304 U.S. 375, 58 S.Ct. 963, 82 L.Ed. 1408 (1938), the Court stated that a reviewable 'order' under the similar provision of the Federal Power Act must be 'of a definitive character dealing with the merits of a proceeding before the Commission and resulting from a hearing upon evidence and supported by findings appropriate to the case.' Id. at 384, 58 S.Ct. at 967. In that case the Court declined jurisdiction over an interlocutory procedural order arising from an adjudicative proceeding
 
 
 [36]
 86 U.S.App.D.C. at 316-317, 181 F.2d at 798-799. We did indicate that we would review the rule for procedural defects apparent on its face
 This is not a case where the Commission has asserted authority under one of the many sections of the Act which specifically require a hearing. If a hearing had been denied under such circumstances, we would have no difficulty in ordering one to be held.
 Id. In section II of the present opinion we conclude that Order No. 467 is not procedurally defective on its face.
 
 
 [37]
 See Morgan v. United States, 298 U.S. 468, 480, 56 S.Ct. 906, 80 L.Ed. 1288 (1936); Amoco Oil Co. v. EPA, 163 U.S.App.D.C. 162, at 174, 501 F.2d 722, at 734-735 (1974)
 
 
 [38]
 See, e.g., Wisconsin v. FPC, 110 U.S.App.D.C. 260, 292 F.2d 753 (1961); Magnolia Petroleum Co. v. FPC, 236 F.2d 785, 791 (5th Cir. 1956), cert. denied, 352 U.S. 968, 77 S.Ct. 356, 1 L.Ed.2d 322 (1957); Amerada Petroleum Corp. v. FPC, 231 F.2d 461 (10th Cir. 1956)
 
 
 [39]
 Deutsche Lufthansa Aktiengesellschaft v. CAB, 156 U.S.App.D.C. 191, 194 & n. 5, 479, F.2d 912, 915 & n. 5 (1973); Mobil Oil Corp. v. FPC, 152 U.S.App.D.C. 119, 129, 469 F.2d 130, 140 (1972); Chicago v. FPC, 147 U.S.App.D.C. 312, 321, 322 & n. 45, 458 F.2d 731, 740, 741 & n. 45 (1971), cert. denied, 405 U.S. 1074, 92 S.Ct. 1495, 31 L.Ed.2d 322 (1972); Environmental Defense Fund, Inc. v. Hardin, 138 U.S.App.D.C. 391, 397 n. 27, 428 F.2d 1093, 1099 n. 27 (1970) (Chief Judge Bazelon, author of the United Gas Pipeline decision, questions its continued vitality); see FPC v. Texaco, Inc., 417 U.S. 380, 94 S.Ct. 2315, 41 L.Ed.2d 141 (1974) (accepted jurisdiction to review an FPC rule); Public Service Comm'n of New York v. FPC, 150 U.S.App.D.C. 47, 49, 463 f.2d 883, 885 (1972) (accepted jurisdiction to review an FPC rule). See generally Gage v. AEC, 156 U.S.App.D.C. 231, 235 & n. 13, 479 F.2d 1214, 1218 & n. 13 (1973)
 
 
 [40]
 147 U.S.App.D.C. at 320, 324, 458 F.2d at 739, 743. There was no suggestion in Chicago that the order was a general statement of policy. Indeed, the court stated, 'The Commission and intervenors . . . claim that the proceeding was intended as, and understood to be, a 'rule-making' proceeding from the outset.' Id., at 320, 458 F.2d at 739. Petitioners contended that the proceeding was adjudicative
 
 
 [41]
 Abbott Laboratories v. Gardner, 387 U.S. 136, 149, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967)
 
 
 [42]
 Recent decisions in this and other circuits have utilized the Abbott Laboratories factors in determining jurisdiction under section 19(b). In Chicago we relied on Abbott Laboratories in concluding that the Commission's order was 'final' for purposes of review. 147 U.S.App.D.C. at 321 n. 43, 458 F.2d at 740 n. 43. In Michigan Power Co. v. FPC, 161 U.S.App.D.C. 221, at 223, 494 F.2d 1140, 1142 (1974) and Phillips Petroleum Co. v. FPC, 475 F.2d 842, 847 (10th Cir. 1973), the courts expressly applied the Abbott Laboratories criteria in determining section 19(b) jurisdiction
 In Atlanta Gas Light Co. v. FPC, 476 F.2d 142 (5th Cir. 1973), the court upheld jurisdiction to review an interim curtailment plan which had been adopted in an adjudicative proceeding before the Commission. The court stated that a prerequisite to section 19(b) jurisdiction is that the order must be 'definitive'; that is, the order must have 'some substantial effect on the parties which cannot be altered by subsequent administrative action.' Id. at 147. In concluding that the interim curtailment plan was 'definitive' the court effectively satisfied the Abbott Laboratories requirement that the order have a present impact on the parties. See id., at 148. The court did not discuss the other Abbott Laboratories criterion-- that the issues be suitable for review-- presumably because petitioners had challenged only the procedural aspects of the order implementing the interim curtailment plan.
 In two recent decisions this court accepted jurisdiction under section 19(b) without extensive discussion. Mobil Oil Corp. v. FPC, 152 U.S.App.D.C. 119, 129, 469 f.2d 130, 140 (1972), cert. denied, 412 U.S. 931, 93 S.Ct. 2749, 37 L.Ed.2d 159 (1973); Public Service Comm'n for New York v. FPC, 150 U.S.App.D.C. 47, 49, 463 F.2d 883, 885 (1972). Mobil involved a rule which prescribed rate ceilings in the Southern Louisiana Area. Public Service Comm'n involved a rule which established a one-day suspension period before rates could go into effect. Both rules had been adopted in proceedings which complied with the APA rulemaking requirements. 152 U.S.App.D.C. at 128, 469 F.2d at 139; see 150 U.S.App.D.C. at 48, 463 F.2d at 884.
 
 
 [43]
 Chicago v. FPC, 147 U.S.App.D.C. 312, 322 n. 45, 458 F.2d 731, 741 n. 45 (1971)
 
 
 [44]
 In the United Gas Pipeline decision the court stated:
 The central question here is the effect of Order No. 144 on certain contracts of petitioner. Yet we do not even have such contracts before us as part of the record. Nor do we have the aid of testimony, affidavits, etc.
 86 U.S.App.D.C. at 317, 181 F.2d at 799.
 In a recent decision, FPC v. Texaco, Inc., 417 U.S. 380, 94 S.Ct. 2315, 41 L.Ed.2d 141 (1974), the Supreme Court reviewed certain aspects of an FPC rule which relieved small producers from all filing requirements under the Natural Gas Act. However, the Court declined to pass on the petitioners' assertion that the results of the rule would be confiscatory. This issue was premature, said the Court, because the rule was still experimental and its effect would be unknown until the rule was applied in individual cases. Id. at 392, 94 S.Ct. 2315.
 
 
 [45]
 Arkansas Louisiana Gas Company, supra, p. 53, Docket No. RP71-122, issued January 5, 1973