DOW CHEMICAL, USA, An operating unit of the Dow Chemical Co. Diamond Shamrock Corp., Ethyl Corporation, PPG Industries, Inc., Stauffer Chemical Company, Vulcan Materials Company,

v.

CONSUMER PRODUCT SAFETY COMMISSION.

No. 781166.

United States District Court,
W. D. Louisiana,
Lake Charles Division.

Nov. 1, 1978.

Theodore L. Garrett and Corinne A. Goldstein, Covington & Burling, Washington, D.C., Gene W. Lafitte, John M. Wilson, J. Berry St. John, Jr., Liskow & Lewis, New Orleans, La., George H. Robinson, Jr., Liskow & Lewis, Lafayette, La., Oliver P. Stockwell, Stockwell, Sievert, Viccellio, Clements & Shaddock, Lake Charles, La., for plaintiffs.

Frances O. Allen, Asst. U. S. Atty., Shreveport, La., John R. Fleder, Consumer Affairs Section, Antitrust Division, U. S. Dept. of Justice, Washington, D.C., Margaret A. Freeston, Acting Gen. Counsel, D.

Stephen Lemberg, Asst. Gen. Counsel, David Melnick, Atty., Consumer Product Safety Commission, Washington, D.C., for defendants.

## OPINION

VERON, District Judge.

This action challenges certain regulations promulgated on June 13, 1978 by the Consumer Product Safety Commission ("CPSC") pursuant to the Consumer Product Safety Act, 15 U.S.C. § 2051 *et seq.* and the Federal Hazardous Substances Act, 15 U.S.C. § 1261 *et seq.,* because the CPSC failed to follow the notice and comment provisions of the Administrative Procedure Act, 5 U.S.C. § 553(b), (c). Published at 43 Fed.Reg. 25658 and proposed to be added as a new Part 1040 to Title 16 of the Code of Federal Regulations, these regulations entitled "Interim Policy and Procedure for Classifying, Evaluating, and Regulating Carcinogens in Consumer Products," relate to the classification, evaluation, and regulation of substances in consumer products that are suspected of causing cancer. In addition to general provisions, these "interim regulations" consist of three types of provisions: (1) internal procedures which describe the steps the CPSC staff will follow in reviewing and analyzing information which it receives concerning possible health risks associated with substances used in consumer products (§§ 1040.12, 1040.23, and 1040.24; 43 Fed.Reg. 25661, 2566364); (2) a description of the types of information and factors that the staff and commission will examine in assigning priorities for the detailed investigation of products containing classified substances (§§ 1040.11, 1040.23, 1040.31 and 1040.33; 43 Fed.Reg. 25659 and 2566325664); and (3) a statement of certain general scientific and regulatory principles which the CPSC will apply in classifying substances. (§§ 1040.21 and 1040.22; 43 Fed.Reg. 2566163).

Plaintiff, Louisiana Chemical Association, is a Louisiana corporation which represents 58 chemical companies throughout the State of Louisiana, including facilities in this district and division, which are adversely affected by the subject interim regulations. The individually named corporate plaintiffs manufacture and sell chemicals including perchloroethylene ("perc"), a chemical widely employed in dry cleaning and other applications. Plaintiff, PPG Industries, manufactures perc at its plant in Lake Charles, Louisiana. Defendant, Consumer Product Safety Commission, is an agency of the federal government and is charged with responsibility for administering the Consumer Product Safety Act, 15 U.S.C. § 2051 *et seq.* and the Federal Hazardous Substances Act, 15 U.S.C. § 1261 *et seq.*

Plaintiffs filed their complaint on September 12, 1978 seeking to permanently enjoin and restrain defendant and its agents or employees from enforcing or applying the interim regulations or any provision thereof found to be unlawful to perchloroethylene or any other substance.

■ Although the plaintiffs have pleaded several jurisdictional grounds,[1] the court finds that it has jurisdiction of this matter by virtue of 28 U.S.C. § 1337, which provides:

> The district courts shall have original jurisdiction of any civil action or proceeding arising under any Act of Congress regulating commerce . . . .

■ The general purpose of the Consumer Product Safety Act is to protect individuals who use consumer goods and suggests a Congressional intention to regulate commerce.[2] The regulation of commerce aspect of this legislation was explicitly set forth in 15 U.S.C. § 2051(a)(6):

> The Congress finds that . . . regulation of consumer products the distribution or use which affects interstate or foreign commerce is necessary to carry out this chapter.

---

1. The other asserted bases for jurisdiction are 28 U.S.C. §§ 1331(a) and 1361. Declaratory relief is sought under 28 U.S.C. §§ 2201 and 2202.

2. *See, e. g.,* S.Rep.No.835, 92d Cong., 2d Sess. 7 (1972); H.R.Rep.No.1153, 92d Cong., 2d Sess. 21–24, 26–27 (1972), U.S.Code Cong. & Admin. News 1972, p. 4573.

Thus, it is clear that the Consumer Product Safety Act can be included under the umbrella of § 1337.[3] Furthermore, section 1337 constitutes an appropriate basis for the review of an administrative decision. *Davis v. Romney,* 490 F.2d 1360 (3d Cir. 1974). Venue in this district is proper under 28 U.S.C. § 1391(e).[4]

The CPSC has considered at various administrative stages[5] the classification of perc as a Category A substance under the regulations, *i. e.* a substance which the Commission finds to possess strong evidence of carcinogenicity based on criteria set forth in the rules (Section 1040.22(a); 43 Fed.Reg. 25663.) The Commission had decided to formally vote on the provisional classification of perc as a Category A substance at a meeting on September 14, 1978.

The court entertained plaintiff's motion for a temporary restraining order on September 14, 1978. After deliberate consideration we issued a temporary restraining order prohibiting the CPSC, its employees, agents, or successors from provisionally classifying perc pursuant to the June 13, 1978 promulgations.[6]

Plaintiffs, pursuant to Rule 65(a) of the Federal Rules of Civil Procedure, subsequently moved this court to grant a preliminary injunction barring enforcement of the challenged regulations. Plaintiffs urged that such an injunction be granted because

---

**3.** It should be noted that when the Consumer Product Safety Act and the Federal Hazardous Substances Act were codified in the United States Code, they were placed in Title 15, which deals with trade and commerce.

**4.** 28 U.S.C. § 1391(e) provides that:

A civil action in which each defendant is an officer or employee of the United States or an agency thereof acting in his official capacity or under color of legal authority, or an agency of the United States, or the United States may, except as otherwise provided by law, be brought in any judicial district in which (1) a defendant in the action resides, or (2) the cause of action arose, or (3) any real property involved in the action is situated, or (4) the plaintiff resides if no real property is involved in the action.

The term "plaintiff" as used in subsection (4) of section 1391(e) relating to venue where no real property is involved means a plaintiff rather than all the plaintiffs. *Natural Resources Defense Council, Inc. v. Tennessee Val. Authority,* 340 F.Supp. 400 (S.D.N.Y.1971), *rev'd on other grounds,* 459 F.2d 255 (2d Cir. 1972). One of the major purposes of § 1391(e) was to make suits by citizens against government agencies and their officials more convenient for plaintiffs. Limiting § 1391(e) to cases where all plaintiffs reside in the district would frustrate this objective, and encourage multiple litigation involving similar disputes by disparate parties in the already overburdened federal courts.

Thus, venue is proper in this court in this action since several of the plaintiffs reside in the Lake Charles Division of the Western District of Louisiana. This court expresses no view on plaintiff's contention asserted in the complaint that they are "adversely affected by these rules and regulations within this District, and the cause of action thus arises here."

**5.** On June 5, 1978, before the interim regulations were published, the CPSC staff submitted to the Commission a memorandum entitled "Preliminary Screening and Classification of Tetrachloroethylene (Perchloroethylene)." This memo recommended that perc be classified provisionally as a Category A substance and notice of that action be published in the Federal Register.

By memorandum dated July 18, 1978, the CPSC Office of General Counsel submitted to the Commission a memorandum entitled "Preliminary Screening and Classification of Tetrachloroethylene (Perchloroethylene)." The memo states that the CPSC staff "believes that a provisional classification of tetrachloroethylene as a Category A substance is warranted." The memorandum attaches, "for the Commission's consideration, a draft Federal Register notice publishing the Category A classification for comment."

On July 27, 1978, the Commission held a meeting to review the preliminary screening and classification of perc and to vote on the recommendation of the CPSC staff to place it in Category A and to approve a Federal Register notice of provisional classification pursuant to the CPSC's interim regulations. By a 3 to 1 preliminary vote, the CPSC approved the provisional classification of perc as Category A.

**6.** Pursuant to Federal Rule of Civil Procedure 65(b) the temporary restraining order of September 14, 1978 was later extended for an additional ten days. The temporary restraining order of September 14 and its subsequent extension were expressly limited to perc on defense counsel's guarantee that the Commission would not undertake to classify any other consumer product prior to the court's disposition of the motion for a preliminary injunction. However, the preliminary injunction issued by this court on September 28, 1978 did include any other consumer products.

the June 13, 1978 interim regulations comprise rules that were enacted in violation of the Administrative Procedure Act, 5 U.S.C. § 553(b), (c). The motion was heard on September 28, 1978 and the court at that time considered the arguments presented there as well as the competent, extensive briefs and exhibits submitted by the parties in arriving at its decision.

The court at oral argument was satisfied that the prerequisites for injunctive relief were met. Cognizant of the impending expiration of our previously granted temporary restraining order, we issued an order that enjoined the defendants, "pending a final determination of the merits of this action or until further order of this court, from provisionally classifying perchloroethylene or any other consumer product pursuant to the regulations promulgated by defendant on June 13, 1978, 43 Fed.Reg. 25658665."

At the September 28 hearing we also heard and denied defendant's motion to dismiss on the grounds that plaintiffs had failed to exhaust their administrative remedies and that they had failed to state a claim upon which relief could be granted.

We are, of course, aware of the ramifications of and interest in our decision reviewing these administrative promulgations regulating suspected cancer-causing products. Through this opinion the court makes good its previous promise to discuss and elucidate more fully its reasons for the denial of the motion to dismiss and the issuance of the preliminary injunction. We will first address the motion to dismiss, for if the court had found this motion to be meritorious, the need for the court to reach the question of compliance with the APA would have been eliminated.

## I. MOTION TO DISMISS

The CPSC's motion to dismiss closely echoes its view as to the merits of the case. The Commission argues that its June 13, 1978 action does not constitute rule-making subject to the notice and comment provisions of the APA and therefore the plaintiffs have not stated a claim upon which

relief can be granted. The court's response to that argument appears in Part II–A of this opinion.

The Commission, additionally and quite similarly, contends that these interim regulations constitute a general statement of policy more analogous to a "press release" than final agency action. The defendant further argues that judicial review is inappropriate at this time because plaintiffs have failed to exhaust their administrative remedies in proceedings involving particular consumer products. The agency finally alleges that plaintiffs should seek judicial review in the court of appeals after the Commission acts to ban a consumer product.

## A. RIPENESS

5 U.S.C. § 702 provides that "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof." Defendant's position is that the interim regulations do not constitute a final order within the statutory meaning of 5 U.S.C. § 704.

■■ The CPSC's June 13, 1978 regulations are final agency action subject to review. The law of ripeness is now happily a matter of practical common sense. *See, e. g., Mathews v. Eldridge*, 424 U.S. 319, 326–332, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976); *United States v. Storer Broadcasting Co.*, 351 U.S. 192, 76 S.Ct. 763, 100 L.Ed. 1081 (1956); *Frozen Food Express v. United States*, 351 U.S. 40, 76 S.Ct. 569, 100 L.Ed. 910 (1956); *Natural Resources Defense Council, Inc. v U. S. Nuclear Regulatory Comm.*, 539 F.2d 824, 836–38 (2d Cir. 1976), *vacated as moot*, 434 U.S. 1030, 98 S.Ct. 759, 54 L.Ed.2d 777 (1978). For example, in *Columbia Broadcasting System, Inc. v. United States*, 316 U.S. 407, 418–20, 62 S.Ct. 1194, 86 L.Ed. 1563 (1942), the Supreme Court held reviewable a rule of the Federal Communications Commission setting forth certain proscribed contractual arrangements between chain broadcasters and local stations. The Commission exercised its

rule-making power by adopting regulations whose operation was not subject to future administrative determinations, save only as the Commission would be called on to decide in any given case whether a station's contract with a network was within the regulations. Although no license had in fact been denied or revoked, the Supreme Court held the FCC rule was final and subject to judicial review.

The leading ripeness precedent, *Abbott Laboratories, Inc. v. Gardner,* 387 U.S. 136, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967), teaches us that

> the ripeness doctrine['s] . . . basic rationale is to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by challenging parties.

*Id.* at 148–49, 87 S.Ct. at 1515. *Abbott* also suggests the appropriate methodology for deciding whether a particular agency action is ripe for review:

> The problem is best seen in a twofold aspect, requiring us to evaluate both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration.

*Id. See also Toilet Goods Ass'n v. Gardner,* 387 U.S. 158, 162, 87 S.Ct. 1520, 18 L.Ed.2d 697 (1967); *Gardner v. Toilet Goods Ass'n,* 387 U.S. 167, 87 S.Ct. 1526, 18 L.Ed.2d 704 (1967).

 The label an agency attaches to its action is not dispositive. The action may be reviewable even though it is an announcement of a rule or policy that the agency has not yet put into effect. The proposition that the injury need not occur prior to judicial review has been clearly announced in the jurisprudence. *E. g., Flemming v. Florida Exchange,* 358 U.S. 153, 167–68, 79 S.Ct. 160, 3 L.Ed.2d 188 (1958); *Citizens Communications Center v. FCC,* 145 U.S.App.D.C. 32, 447 F.2d 1201 (1971); *Commonwealth of Puerto Rico v.*

*Alexander,* 438 F.Supp. 90 (D.D.C.1977); *Phillips Petroleum Co. v. FEA,* 435 F.Supp. 1239 (D.Del.1977).

 Furthermore, agency action may be reviewable even though it is never to have any formal effect. In recent years federal courts have become sensitive to the need in particular controversies for judicial review of federal administrative action even though it imposes no direct obligation and has no enforcement effect. *Bantam Books, Inc. v. Sullivan,* 372 U.S. 58, 66–69, 83 S.Ct. 631, 9 L.Ed.2d 584 (1963); *Straus Communications, Inc. v. FCC,* 174 U.S.App. D.C. 149, 530 F.2d 1001 (1976); *Continental Air Lines, Inc. v. CAB,* 173 U.S.App.D.C. 1, 18, 522 F.2d 107, 124 (1974); *Citizens Communications Center v. FCC,* 145 U.S.App. D.C. 32, 447 F.2d 1201 (1971). The argument that an order lacks finality because it has no independent effect on anyone has "the hollow ring of another era. Agency orders that have no independent coercive effect are common." *Port of Boston Marine Terminal Ass'n v. Rederiaktiebolagert Transatlantic,* 400 U.S. 62, 71, 91 S.Ct. 203, 209, 27 L.Ed.2d 203 (1970). For example, in *Air Line Pilots Ass'n Int. v. Department of Transportation,* 446 F.2d 236 (5th Cir. 1971), the Fifth Circuit reviewed a determination by the Federal Aviation Administration that a proposed structure would prevent "no hazard" to air navigation. The FAA argued unpersuasively that its "hazard" or "no hazard" determination had no enforceable effect and the proponent of the structure could proceed in his construction with impunity since the only effect of the FAA's determination was its power of moral persuasion. The court noted that "it takes little knowledge of the goings-on about us to be aware that 'moral suasion' is a considerably potent force in our society", *id.* at 241, and that as a practical matter the FAA determination would undoubtedly have a substantial effect upon the ability of the proponent of the structure to secure financing or obtain insurance. In the event that the parties opposing the building sought to prevent construction through some type of common law action, the court found that

the FAA no hazard letter would be almost fatal to this cause of action. The court, evidencing the new judicial pragmaticism in resolving ripeness issues, accordingly granted review of the FAA no hazard letter.

■ The interest in postponing review is strong if the agency action that is at issue is not in fact the agency's final position. If the agency's stance is likely to be abandoned or modified before it is actually put into effect, then judicial review squanders the court's time and interferes with the process by which the agency is attempting to reach a final decision.

■ The CPSC's attempt to defeat review by the bare assertion that the Commission position may someday change can be summarily rejected. These regulations were developed in formal administrative proceedings held over a considerable period of time. This "interim policy statement" itself contains no equivocal or tentative language.[7]

■ For agency action to be reviewable it is required that the interests of those who want relief from the challenged action's "immediate and practical" impact upon them, *Frozen Food Express v. United States,* 351 U.S. 40, 44, 76 S.Ct. 569, 100 L.Ed. 910 (1956), outweigh the interests of the agency and the court in postponing review until the question arises in some more concrete and final form. The hardship to the plaintiffs of withholding judicial review would be substantial. The determination by the CPSC as to the classification and regulatory treatment of suspected carcinogens will have a compelling impact on plaintiffs and their businesses. Less tangible than the immediate economic burden with which plaintiffs are threatened, but a relevant consideration nonetheless, is the continuing damage that the plaintiffs' reputations will necessarily be subject to as long as adjudication of the validity of the regulations is deferred. The Commission, according to these regulations, proposes to

inform the public that the plaintiffs are selling a product which is a carcinogen. Also uncertainty regarding the possible invalidity of the CPSC's regulations could make it difficult for plaintiffs to plan for the future production and distribution of their product.

Thus, this administrative action imposes a penalty far more drastic than the fines customarily inflicted for breach of reviewable administrative orders. Only judicial review can avoid the threatened injury. It would be inequitable to deny the plaintiffs the opportunity to resolve this matter promptly.

This court before abandoning its discussion of ripeness invokes the particularly appropriate caveat of the District of Columbia Circuit, a court with sophisticated expertise in reviewing administrative action:

We do not pretend that the science of assessing an issue's ripeness is an exact one. Agency positions are never absolutely final. There is always some danger in accelerating the review process, and always some hardship in delaying it. If the analysis is an imprecise one, however, it may nevertheless yield clear results, as we think it has in this case. Any doubts we might have are resolved by the presumption of reviewability . . . The presumption stands on firm ground. However much the courts might prefer to resolve a particular question at another time and place, they should have a very good reason for indulging that preference, if in doing so they are refusing a petitioner's request to be relieved of an onerous legal uncertainty.

*Continental Air Lines, Inc. v. CAB,* 173 U.S.App.D.C. 1, 522 F.2d 107 (1974), *rehearing en banc,* 173 U.S.App.D.C. 1, 7, 522 F.2d 122, 128 (1975).

## B. EXHAUSTION

■ The judiciary employs not only the elusive concepts of ripeness and finality but also the related and often overlapping doctrine of exhaustion of administrative reme-

---

7. The precise language of the June 13, 1978 regulations is analyzed in depth in Part II–A of this opinion. Such an analysis is crucial to the issue whether these promulgations are rules subject to the Administrative Procedure Act.

dies to determine whether and when it should inject itself into the administrative process. While each of these doctrines has its own nuances, common to all is a careful balancing of the need for effective judicial protection and the need for efficient, responsible administrative action. Additionally, the purposes of the exhaustion doctrine are to permit an administrative agency (1) to apply its expertise, (2) to moot judicial controversies, and (3) to develop a factual record. *Parisi v. Davidson,* 405 U.S. 34, 37–38, 92 S.Ct. 815, 31 L.Ed.2d 17 (1972).

The exhaustion doctrine is inapplicable when, as here, the policies supporting the doctrine would not be furthered by its application. *E. g., Consumers Union of United States, Inc. v. Cost of Living Council,* 491 F.2d 1396, 1399 (Em.App.), *cert. denied,* 416 U.S. 984, 94 S.Ct. 2387, 40 L.Ed.2d 761 (1974).

The first supporting rationale of the exhaustion doctrine is absent here, because the legal issue of compliance with the APA is not a factual and technical issue which demands the specialized expertise of the Commission.

It is also practically unlikely in the instant case that the agency will act to correct its procedural error so as to moot this controversy.[8]

Finally, the question presented here as to whether the June 13, 1978 CPSC promulgation were adopted in violation of the APA is strictly a legal one, which does not require development of any further administrative record. A voluminous record on the regulations' application to particular consumer products will have little or no relevance to the question of whether the challenged regulations are lawful under the APA.

The fact that a fundamental legal question is encountered at the threshold here also independently makes the exhaustion doctrine inapplicable. Dispositive of

the merits of this case are the purely legal issues (1) whether the June 13, 1978 action of the CPSC consists of rules or general statements of policy and (2) if rules, whether such regulations were promulgated in violation of the APA's notice and public comment requirements. The resolution of such issues does not require administrative expertise, but rather is a recognized judicial function not requiring exhaustion. Where the contention is that the administrative agency has exceeded its statutory power, "the courts have jurisdiction of suits to enjoin the enforcement of an order, even if the plaintiff has not attempted to secure redress in a proceeding before the Commission." *Skinner & Eddy Corp. v. United States,* 249 U.S. 557, 39 S.Ct. 375, 63 L.Ed. 772 (1919). *See also,* L. Jaffe, Judicial Control of Administrative Action 427–28 (1965).

Application of this exception to the exhaustion doctrine is appropriate where the legal question is whether the procedural requirements of the APA have been satisfied. *E. g., A. E. Stanley Mfg. Co. v. United States,* 310 F.Supp. 485 (D.Minn.1970). For example, *Buckeye Cablevision, Inc. v. United States,* 438 F.2d 948, 952 (6th Cir. 1971), held that exhaustion of administration remedies was not necessary where "the issue of the validity of the adoption of 'Interim Procedures' as viewed in light of the requirements of the Administrative Procedure Act [did] not necessitate the development of facts by the Commission, but rather present[ed] a simple legal issue." We are not aware of any principle of law which requires a party to request an administrative agency to reconsider or review an action of the administrative agency which is allegedly issued in violation of the APA.

Furthermore, the requirement that a plaintiff exhaust his administrative remedies before applying for judicial relief "presupposes the remedy to which he is referred is an effective one." *Marsh v. County*

---

8. The Commission is aware of the legal issue as to the validity of its June 13, 1978 regulations. At the hearing on September 14, 1978 counsel for the Commission stated that the CPSC intended to act under the June 13, 1978 interim policy and would not postpone its action unless ordered to do so by this court. (Tr. 92–93). The CPSC cannot be expected to change its position in subsequent administrative proceedings.

*School Board,* 305 F.2d 94, 98 (4th Cir. 1962). "The logic of the [exhaustion] rule implies that the remedy is (a) available to him on his initiative (b) more or less immediately and (c) will substantially protect his claim of right." L. Jaffe, Judicial Control of Administrative Action 424 (1965). Resort to administrative remedies inadequate to afford the relief sought would obviously be futile, as the jurisprudence recognizes. *E. g., NLRB v. Industrial Union of Marines & Shipbuilding Workers of America,* 391 U.S. 418, 426 n. 8, 88 S.Ct. 1717, 20 L.Ed.2d 706 (1968); *Montana National Bank v. Yellowstone County,* 276 U.S. 499, 505, 48 S.Ct. 331, 72 L.Ed. 673 (1928); *Bituminous Coal Operators' Ass'n v. Secretary of Interior,* 547 F.2d 240, 244 (4th Cir. 1977).

In the case at bar, future administrative proceedings before the CPSC will not avoid the irreparable injury which plaintiffs will suffer absent relief by this court. Besides, those proceedings alone will not resolve the issues presented. The June 13, 1978 regulations are now in effect, and plaintiffs will be foreclosed from challenging the criteria for classification embodied in those regulations at future administrative sessions.

 The exhaustion doctrine is not jurisdictional, but calls for the sound exercise of judicial discretion. *NLRB v. Industrial Union of Marine,* 391 U.S. 418, 426 n. 8, 88 S.Ct. 1717, 20 L.Ed.2d 706 (1968); *United States v. Abilene & So. Ry.,* 265 U.S. 274, 284, 44 S.Ct. 565, 68 L.Ed. 1016 (1924). Consideration of judicial economy weighs heavily in a decision whether exhaustion of remedies should be required. *McKart v. United States,* 395 U.S. 185, 197–99, 89 S.Ct. 1657, 23 L.Ed.2d 194 (1969). Prompt resolution of the threshold legal issue here may forestall duplication and waste in individual proceedings. Neither judicial nor administrative economy would be served by first applying the challenged rules in proceedings as to individual products involving dozens of different companies and products, and then seeking judicial review as to whether the June 13, 1978 CPSC rules were in fact validly adopted initially.

The agency's final contention before arguing the merits is that Congress has provided for review of subsequent action which the CPSC will take as to particular products, and therefore this court should decline to review the action of June 13, 1978. The Commission points out, that under the Hazardous Substances Act[9] and the Consumer Product Safety Act,[10] judicial review is available in the court of appeals *when the CPSC takes final action to ban a hazardous product.* Neither of these statutes providing for court of appeal review of administrative decisions expressly provides that this method of review is exclusive. More importantly, even if implied exclusivity for *future* agency action is proper under these statutes, "[o]ne simple qualification on the principle of exclusivity is presented by an attack on agency orders that are not covered by the provisions for court of appeals review. In such circumstances, it is presumed that review is intended unless a contrary intention is manifest from legislative history, and in the absence of provision for court of appeals review the matter must be taken to a district court, ordinarily for injunctive or declaratory relief." 16 C. Wright, A. Miller, E. Cooper & E. Gressman, Federal Practice and Procedure § 3943 p. 323–24 (1977).

 A federal district court may decline to entertain pre-enforcement judicial review only if Congress intended to prohibit such review:

---

**9.** 15 U.S.C. § 1261(q) relating to articles which are declared banned hazardous substances under the Hazardous Substances Act provides that review of such a CPSC declaration shall be reviewable by the court of appeals under 21 U.S.C. § 371.

**10.** 15 U.S.C. § 2060 provides that any consumer product safety rule declaring a consumer product a banned hazardous product shall be subject to review in a court of appeals. It is relevant to note that subsection (e) of 15 U.S.C. § 2060 provides that "[t]he remedies provided for in this section shall be in addition to and not in lieu of any other remedies provided by law." The Supreme Court thought a similar provision supported its holding of non-exclusivity of appellate court review in *Abbott Laboratories v. Gardner,* 387 U.S. 136, 144, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967).

The first question we consider is whether Congress . . . intended to forbid pre-enforcement review of this sort of regulation . . . The question is phrased in terms of "prohibition" rather than "authorization" because a survey of cases shows that judicial review of a final agency action by an aggrieved person will not be cut off unless there is a persuasive reason to believe that such was the purpose of Congress.

*Abbott Laboratories v. Gardner,* 387 U.S. 136, 139–40, 87 S.Ct. 1507, 1510–11, 18 L.Ed.2d 681 (1967). A Congressional intent to prohibit pre-enforcement declaratory relief may be found only when the statutory language or legislative history demonstrate such an intent by "clear and convincing" language. *Id.* at 141, 87 S.Ct. 1507. *See also,* L. Jaffe, Judicial Control of Administrative Action 336359 (1965). In the instant case Congress has not specified another method of judicial review as exclusive and the criteria for preclusion of judicial review are not satisfied.

## II. PRELIMINARY INJUNCTION

■ The standards for reviewing a motion for preliminary injunction are well-established. To obtain the injunctive relief sought, plaintiffs must prove: (1) that there is a substantial likelihood that they will succeed on the merits of their claims;[11] (2) that there is a substantial threat that plaintiff will suffer irreparable injury if an injunction is not granted; (3) that the threatened injury to the plaintiff outweighs the threatened harm the injunction may do to the defendant; and (4) that the granting of the preliminary injunction will not disserve the public interest. *Barrett v. Roberts,* 551 F.2d 662 (5th Cir. 1977); *Canal Authority v. Callaway,* 489 F.2d 567 (5th

Cir. 1974); *Allison v. Froehlke,* 470 F.2d 1123 (5th Cir. 1972); *Manufacturing Chemists Association v. Costle,* 451 F.Supp. 902 (W.D.La.1978).

## A. SUBSTANTIAL LIKELIHOOD OF EVENTUAL SUCCESS

■ Perhaps the most significant factor to be considered in determining whether a preliminary injunction should be granted is the likelihood that the movant will succeed when his claim is ultimately judged on its merits at a subsequent proceeding. The court preliminarily finds that the CPSC, in promulgating the interim regulations without prior notice and an opportunity for public comment, violated the Administrative Procedure Act. ("APA"). In essence, the CPSC has placed the proverbial cart before the horse. Specifically, the APA requires an agency engaged in "informal rulemaking" to provide notice of proposed rules in the Federal Register, 5 U.S.C. § 553(b), and to solicit comments from interested parties, 5 U.S.C. § 553(c).

However, "statements of policy" are specifically exempt from the notice and comment procedures. 5 U.S.C. § 553(b)(A). The CPSC relies on this exemption to justify its failure to comply with the APA's procedural requirements.

■ The APA mandates quite clearly that, in reviewing agency action, a court "shall . . . hold unlawful and set aside agency action . . . found to be —(D) without observance of procedure required by law . . ." 5 U.S.C. § 706. Numerous cases have held that an administrative rule which is not issued in accordance with the prior notice and opportunity for public comment procedures of Section 553 of the APA is void. *See, e. g., Wagner*

---

11. The importance of this requirement varies with the relative balance of threatened hardships facing each of the parties. *Canal Authority of State of Florida v. Callaway,* 489 F.2d 567 (5th Cir. 1974). Professors Wright and Miller suggest that:

> [A]lthough a showing that plaintiff will be more severely prejudiced by a denial of the injunction than defendant would be by its grant does not remove the need to show

some probability of winning on the merits, it does lower the standard that must be met. Conversely, if there is only slight evidence that plaintiff will be injured in the absence of interlocutory relief, the showing that he is likely to prevail on the merits is particularly important.

C. Wright & A. Miller, Federal Practice and Procedure § 2948, p. 455 (1973).

*Electric Corp. v. Volpe,* 466 F.2d 1013 (3d Cir. 1972); *City of New York v. Diamond,* 379 F.Supp. 503 (S.D.N.Y.1974).

Informal rule-making has been heralded as one of the most successful innovations of administrative law. It is a truly democratic procedure and provides the agency with channels of information. It is fair to all parties and produces a record by which the courts and Congress can efficiently supervise agency action.

 Solicitation of comments is the basis of informal rule-making, because it is the means by which the public participates in the rule-making process. It is also an efficient channel through which experts in the field and those affected by the proposed rules can provide information which may have been overlooked by the agency, can point out the abstruse effects of the proposed rules, and can suggest alternatives. *See generally* K. Davis, Administrative Law § 6.03 (3rd ed. 1972). The solicitation of comments serves another important function. Judicial review of informal rule-making must be based on the record kept by the agency of its rule-making procedure. 5 U.S.C. § 706 (1970). One of the essential elements of that record is the comments solicited from interested parties.

When the fourth branch of the government ignores the Congressional dictates of the APA, it opens itself to harsh criticism. While this reprobation surely is not always valid or justified, it is clear that the independent regulatory commissions sometimes have or are perceived to have "failed to discharge their respective mandates to protect the interests of the public in given fields of administration." Stewart, *The Reformation of American Administrative Law,* 88 Harv.L.Rev. 1667, 1670 (1975).

 The CPSC does not profess to have complied with the notice and comment requirements here. Rather the Commission states in the preamble to these interim regulations that it considers the regulations to be "a general statement of policy, . . . exempt from the notice, public procedure and delayed effective date provisions of the

Administrative Procedure Act." 43 Fed. Reg. 25658 (June 13, 1978). This court in determining whether the CPSC complied with the procedural requirements of the APA is not bound by the delineation the Commission has attached to its action. Rather the court has the responsibility to examine the substance of what has been done affording appropriate respect for the agency's characterization. *Continental Air Lines, Inc. v. CAB,* 173 U.S.App.D.C. 1, 8, 522 F.2d 107, 116 (1974), *rehearing en banc,* 173 U.S.App.D.C. 1, 3, 522 F.2d 122, 124 (1975).

The Administrative Procedure Act defines a "rule" to mean:

the whole or a part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy . . . and includes the approval or prescription for the future of . . . valuations, costs, or accounting, or practices bearing on any of the foregoing.

5 U.S.C. § 551(4).

The APA does not define the term "general statements of policy."

The court in resolving whether these regulations are statements of policy or rules will not abandon common sense and equitable principles, but rather will recollect the basic purpose of the statutorily imposed requirements of notice and comment. The APA's rule-making procedures "were designed to assure fairness and mature consideration of rules of general application." *NLRB v. Wyman-Gordon Co.,* 394 U.S. 759, 764, 89 S.Ct. 1426, 1429, 22 L.Ed.2d 709 (1969).

 Additionally, this court in determining the legal issue presented herein is guided by a substantial body of jurisprudence which announces several general principles to be utilized in distinguishing a policy statement from a rule:

(1) Is the announcement subject to change prior to its implementation? *Continental Air Lines, Inc. v. CAB,* 173 U.S.App.D.C. 1, 522 F.2d 107 (1974), *rehearing en banc,* 173 U.S.

App.D.C. 1, 4, 522 F.2d 122, 125 (1975).

(2) Does the announcement focus the agency's attention on a fixed set of criteria that might have been formulated differently if there had been an opportunity for public comment? *Pickus v. U. S. Board of Parole,* 165 U.S.App.D.C. 284, 290, 507 F.2d 1107, 1113 (1974); *St. Francis Memorial Hospital v. Weinberger,* 413 F.Supp. 323, 329 (N.D.Cal.1975).

(3) Will the inquiry in subsequent rulemakings be whether the facts fit the alleged policy or will the policy itself be subject to challenge in such proceedings? *Pacific Gas & Electric Co. v. FPC,* 164 U.S.App.D.C. 371, 376, 506 F.2d 33, 38 (1974).

(4) Does the announcement have a substantial impact on regulated parties so as to make the process of public comment an important requirement? *National Motor Freight Association v. United States,* 268 F.Supp. 90, 96 (D.D.C.1967) (three judge court), *aff'd per curiam,* 393 U.S. 18, 89 S.Ct. 49, 21 L.Ed.2d 19 (1968); *National Helium Corp. v. FEA,* 569 F.2d 1137, 1145–46 (Em.App.1977); *Texaco, Inc. v. FPC,* 412 F.2d 740, 744 (3d Cir. 1969).

We find that the June 13, 1978 regulations are not subject to change prior to their implementation. Although these announcements are ostensibly labelled in the defense brief as "temporary policy and procedure," there is language employed in the Federal Register announcement itself which dispositively indicates that these regulations are made effective immediately upon publication and will be followed in subsequent proceedings. The "Summary" paragraph of the preamble to these interim regulations states that "the purpose of this document is to *establish* on an interim basis" the Commission's policy for the regulation of carcinogens in consumer products. 43 Fed.Reg. 25658 (emphasis added). This same paragraph further states that the CPSC action establishes "(1) [t]he standards CPSC *will apply* in classifying substances suspected of causing cancer, and evaluating products containing such substances, and (2) the regulatory *action likely to be taken* by the CPSC following classification and evaluation." *Id.* (emphasis added.) The Federal Register notice also indicates how regulatory action will be taken as to particular products or classes of products in the future. Such determinations "will continue to be made in individual proceedings, in accordance with the applicable statutory provisions *and the terms of this policy statement.*" *Id.* (emphasis added).

Furthermore, the Commission does intend to apply and follow the interim regulations. The preamble expressly indicates that the Commission "is interested in gaining some *practical experience* from the operation of the policy and procedure set forth in the document . . . [a]ccordingly, the policy and procedure will be effective on an interim basis as of the date of publication of this document in the Federal Register." *Id.* (emphasis added). The Commission would be hard pressed to gain practical experience from the "policy" unless it is implemented or followed. The agency's present intent to implement this policy is substantiated by other extrinsic evidence.[12]

The court finds that the June 13, 1978 regulations consist of substantive pronouncements which narrow the field of vision of the administrative proceedings.

---

12. For example, the July 18, 1978 memorandum from Mr. Melnick of the Office of General Counsel states that the Commission should review the information furnished by the staff "[i]n accordance with section 1040.23 of the policy." Exhibit 3 to plaintiff's September 12, 1978 memorandum.

Similarly, the draft Federal Register notice with respect to perc, which is attached to this memorandum, states that "[t]his interim policy and procedure establishes a four-step process *to be followed* by CPSC for: the preliminary screening of substances about which a question of carcinogenicity has been raised; the classification of those substances used in consumer products; the evaluation of consumer products containing classified substances; and a determination as to any regulatory action to be taken regarding those products." *Id.* (emphasis added).

Both parties cite *Pacific Gas & Electric Co. v. FPC*, 164 U.S.App.D.C. 371, 506 F.2d 33 (1974) to support their relative positions. That leading precedent stated that the critical distinction between a substantive rule and a general statement of policy is the different practical consequence that these two pronouncements have in subsequent administrative proceedings. A substantive rule

> . . . establishes a standard of conduct which has the force of law. In subsequent administrative proceedings involving a substantive rule, the issues are whether the adjudicated facts conform to the rule and whether the rule should be waived or applied in that particular instance. The underlying policy embodied in the rule is not generally subject to challenge before the agency.

*Id.* 164 U.S.App.D.C. at 376, 506 F.2d at 38. On the other hand, a general statement of law

> . . . does not establish a "binding norm." It is not finally determinative of the issues or rights to which it is addressed. The agency cannot apply or rely upon a general statement of policy as law because a general statement of policy only announces what the agency seeks to establish as policy. A policy statement announces the agency's tentative intentions for the future. When the agency applies the policy in a particular situation, it must be prepared to support the policy just as if the policy statement had never been issued.

*Id.*

The inference is inescapable that if perc possesses the relevant scientific characteristics enunciated in the regulations, it will be classified as a Category A substance. Defense counsel argues that CPSC will allow, before it takes final regulatory action, any person whose product might be regulated as a carcinogen to contend that the scientific principles embodied in the regulations are incorrect or unsupportable and therefore should not be applied. However, this argument is not supported by the regulations themselves. One searches in vain for something in the interim policy that guarantees affected persons the right to challenge the underlying premises reflected in those rules in subsequent proceedings. Under the regulations the issue at any hearing on a particular substance will not be whether the substance is a carcinogen, but rather whether the criteria established in Section 1040.22 have been met.

The Commission's action will additionally have an immediate adverse impact on plaintiffs. Experience and common sense indicates that the implementation of this interim policy in proceedings involving individual consumer products will result in substantial loss of business for the plaintiffs as verified by the numerous affidavits filed herein.

██ Finally in evaluating whether an agency's action has a substantial impact, and is thus subject to the rule-making provisions of the APA, an appropriate consideration is "whether there is such genuine ground for difference of opinion on the wisdom of the policy embodied in the rule as to make the hearing process a meaningful and important requirement." *St. Francis Memorial Hospital v. Weinberger*, 413 F.Supp. 323, 329 (N.D.Cal.1975). In the scientific community there presently exists a vigorous debate as to the classification of carcinogens, risk evaluation, and the appropriate regulatory response. Three examples of the scientific issues involved in the interim regulations conclusively illustrate the uncertainty that permeates the cancer research field.

Section 1040.21(b)(2)(ii)(C) of the CPSC interim regulations states that "[t]esting of chemicals at high exposure levels, at or approaching the maximum tolerated dose, is employed to compensate for the limited number of animals available for long term bioassays and CPSC will consider results in such tests reliable indicators of carcinogenicity." The contention that high dose levels are the equivalent of, or a substitute for,

large numbers of animals is scientifically questionable.[13]

There also remains a basic controversy as to the relevance of animal data to potential human carcinogenic risk.[14] Section 1040.-22(a)(1) of the regulations provides that a finding by the National Cancer Institute that a substance is an animal or human carcinogen merits classification of that substance as Category A.

The CPSC interim policy in Section 1040.-21(b)(2)(ii)(E) states that "CPSC proposes placing the same weight on the results of animal experiments in which only benign tumors are observed, as upon experiments in which both malignant and benign tumors are observed" and in the instances "where benign, but not malignant, tumors are observed, CPSC will give these results the same weight as tests resulting in malignant tumors." The CPSC position on benign tumors, without appropriate qualifications and provisions for scientific evaluation of all pertinent data, is contrary to other qualified opinion.[15]

The court, without intimating any opinion on the merits of the relative scientific positions, confidently concludes that these examples demonstrate that the interim rules should have been announced only af-ter the informed reflection and genuine dialogue contemplated by the APA.[16]

## B. IRREPARABLE HARM

Concepts such as irreparable harm are incapable of precise definition and, by their nature, depend on the circumstances surrounding each case. The plaintiffs aver, by way of their complaint and numerous affidavits, that a provisional determination by the CPSC that perc is a Category A substance, and the publication in the Federal Register of that determination, will result in a substantial loss of business and much adverse publicity.

The defense's only rejoinder is that if this court grants the preliminary injunction the Commission has several other alternative routes for continuing its investigation of perc and informing the public that the Commission is still examining the substance and products containing it. The Commission does not specify precisely the other avenues it is contemplating, and the court will not so speculate. However, we suggest that the harm which would accrue from a provisional classification of perc pursuant to these regulations is comparatively more grievous than the potential injury resulting from a less formal alternative. Furthermore, the court is quite frankly puzzled that

---

13. *See generally* M. Cranmer, *Final Report on Saccharin,* 1–2 (June 7, 1978); P. J. Gehring and G. E. Blair, *Mechanisms of Carcinogenesis: Dose Response,* J. Environ. Path. Toxicol., 1:163–179 (1977).

14. *See generally* Hearings before the Subcommittee on Oversight and Investigations, House Committee on Interstate and Foreign Commerce, 95th Cong., 2d Sess., (Jan. 23, 1978); Saccharin and Its Salts, Proposed Rule Making, 42 Fed.Reg. 19996, 20001 (Apr. 5, 1977).

15. *See generally* National Cancer Advisory Board, General Criteria for Assessing the Evidence for Carcinogenicity of Chemical Substances: Report of the Subcommittee on Environmental Carcinogenesis, National Cancer Advisory Board. J. Natl. Cancer Inst., 58(2): 461–65 (1977).

16. Plaintiffs in their complaint have also alleged that the interim regulations contain criteria governing the classification of substances as Category A or B that are arbitrary, capricious and unsupported by the record, and regulations governing the regulatory treatment of Category A and B substances that are arbitrary and contrary to the requirements of the Consumer Product Safety Act and the Federal Hazardous Substances Act.

The APA does provide that a reviewing court shall hold unlawful and set aside agency action adjudicated to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). *See generally Manufacturing Chemists Association v. Costle,* 451 F.Supp. 902 (W.D.La.1978).

The court at this time makes no ruling as to this particular attack levied by the plaintiffs. In resolving whether plaintiffs are likely to succeed at trial, the court need not conclude that the plaintiffs would succeed in each of their individual arguments. Rather this court's finding that the APA's notice and comment provisions have likely been violated adequately supports a preliminary injunction. That particular assault alone is sufficient to mandate the invalidation of the challenged regulations.

the CPSC would oppose this preliminary injunction, if it could achieve its desired objective as effectively through other means.

■ Once the news of provisional classification is disseminated, the court becomes powerless to protect or to restore the status quo pending a final determination of the merits. A preliminary injunction is especially appropriate where the action sought to be enjoined would "impair the court's ability to grant an effective remedy." II C. Wright & A. Miller, Federal Practice and Procedure, § 2948, p. 434 (1973).

## C. IMPACT ON DEFENDANTS

The court cannot envision any possible harm to the Commission if the June 13, 1978 regulations are enjoined for the several weeks within which it will take us to decide the merits of this case. The statutes under which the CPSC purports to act were enacted years ago.[17] The CPSC moved at a glacial pace in proclaiming its rules for dealing with purported carcinogens. The Commission's program will not be harmed by the short delay which would be imposed by the granting of plaintiff's motion for injunctive relief.

## D. THE PUBLIC INTEREST

The plaintiffs, the public, and even the defendants themselves possess a strong legitimate interest in ensuring that the integrity of the administrative rule-making process is maintained and that the public at large is afforded an opportunity to comment before an agency implements rules that will significantly affect them. In enacting the APA, Congress essentially decided that the need for procedural due process overrides the interest in an agency's prompt implementation of new programs.

Furthermore, the public will be harmed if substances are classified provisionally as carcinogens on the basis of potentially flawed criteria on which there has been no opportunity for public comment. The pub-lic is additionally interested in not being conceivably falsely alarmed by government agencies about the carcinogenicity of particular substances. Judge J. Skelly Wright of the District of Columbia Circuit in his article, *The Courts and the Rulemaking Process: The Limits of Judicial Review,* 59 Cornell L.Rev. 375, 379 (1974), cogently notes that "put simply, the *public* is treated unfairly when a rulemaker hides his crucial decisions, or his reasons for them, or when he fails to give good faith attention to all the information and contending views relevant to the issues before him. [R]ulemaking must be openly informed, reasoned, and candid."

In sum, any harm to the CPSC that might result if implementation of the regulations is enjoined is far outweighed by the injury to the plaintiffs and the public that will accrue if implementation of the regulations is not enjoined. The scales of justice tip in favor of the plaintiff and ultimately justify the temporary relief.

In summary and conclusion we deny defendant's motion to dismiss on the grounds that plaintiffs have failed to exhaust their administrative remedies and that they have failed to state a claim upon which relief could be granted. The court also holds that plaintiffs have overcome all obstacles in their effort to gain a preliminary injunction and that the injunction should therefore be granted.

The court, in making these rulings, is aware of the proper scope of judicial review of administrative action. The judicial branch, sometimes in the guise of judicial review, has itself directly or indirectly formulated administrative substantive policy. The court here is not reviewing the merits of the rules and standards the CPSC has adopted in attempting to cope with the emotional, highly visible, and potentially volatile issue of regulating suspected cancer-causing products. Our adjudication here addresses itself solely to the legal issues and the procedures by which these rules were formulated.

---

17. The Hazardous Substances Act was enacted in 1960 and amended numerous times thereaft-er. The Consumer Product Safety Act was enacted in 1972.